Naomi A MANDSAGER, Plaintiff,

v.

UNIVERSITY OF NORTH CAROLINA AT GREENSBORO, Brad Bartel, in his official and individual capacities, and L. Diane Borders, in her official and individual capacities, Defendants.

No. 1:00 CV 01018.

United States District Court, M.D. North Carolina.

July 1, 2003.

Denis E. Jacobson, Amanda Leigh Fields, Tuggle, Duggins & Meschan, P.A., Greensboro, NC, for plaintiff.

Donald Ralph Esposito, Jr., N.C. Department of Justice, Education Section, Thomas O. Lawton, III, N.C. Department of Justice, John P. Scherer, II, N.C. Department of Justice, Office of the Attorney General, Raleigh, NC, for defendants.

## MEMORANDUM OPINION

TILLEY, Chief Judge.

This matter is before the Court on Defendants' Motions to Dismiss pursuant Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure [Docs. # 7, 9]. For the reasons stated below, the Defendants' motions are GRANTED IN PART and DENIED IN PART.

## I.

The allegations of the complaint, stated in the light most favorable to the plaintiff, are as follows. In August 1996, Plaintiff Naomi Mandsager enrolled as a Doctor of Philosophy degree ("PhD") candidate in the Department of Counseling and Educational Development ("CED") in the School of Education at the University of North Carolina at Greensboro ("UNCG"). As of December 1998, with the exception of one educational research methodology course, Ms. Mandsager had completed all of the course work required for the PhD program and had taken and passed almost all of her comprehensive exams. In addition to the research methodology course, Ms. Mandsager needed to take the research and statistics comprehensive exam and write and defend her dissertation.

In October 1998, Ms. Mandsager was diagnosed with a specific learning disability in mathematics and communicated this diagnosis to the chair of the Department of Counseling and Educational Development

("Dr.Borders"). Dr. Borders informed Ms. Mandsager that she would be allowed to complete the education research methodology course as an independent study to accommodate the learning disability.

While Ms. Mandsager was enrolled as a graduate student, she was employed by UNCG as a graduate assistant, a clinical supervisor, and a teaching assistant. During the 1998–99 academic year, Ms. Mandsager's direct supervisor for her duties as a research and teaching assistant was Dr. William Purkey, a UNCG faculty member and full-time professor in the School of Education. While Dr. Purkey was Ms. Mandsager's supervisor, he often put his arm around her, called her "honey," stated "If I weren't married, I'd be courting Naomi," and signed business correspondence to Ms. Mandsager as "Affectionately, William" or "Love, William." Dr. Purkey also began each of his classes with "calisthenics exercises" in which he had students jump up and down on one foot.

In response to this conduct, Ms. Mandsager made complaints to Dr. Borders on "numerous occasions." Comp. ¶ 22. At one point, Dr. Borders responded by stating "William will be William," or something to that effect. It does not appear that Dr. Borders took any action in response to Ms. Mandsager's initial complaints. Ms. Mandsager also spoke to Dr. Borders when Dr. Purkey asked Ms. Mandsager to make a presentation on sexual harassment to a class in which Ms. Mandsager was a student. Dr. Borders told Ms. Mandsager to tell Dr. Purkey that she did not want to make the presentation. Ms. Mandsager did so, but Dr. Purkey insisted that she make the presentation. Ms. Mandsager attended the class, handed out materials on sexual harassment, and left the classroom.

On or about March 19, 1999, Dr. Purkey's conduct "escalated" into a direct sexual proposition, (Compl.¶ 26) which Dr. Purkey has admitted having made. A few days afterward, on March 23, 1999, Ms. Mandsager again went to Dr. Borders. Dr. Borders told Ms. Mandsager that she would take action only if Ms. Mandsager made a more formal complaint in writing. Ms. Mandsager made a complaint in writing approximately one week later. Ms. Mandsager also asked Dr. Borders what could be done about the fact that Ms. Mandsager was currently enrolled in one of Dr. Purkey's classes. Dr. Borders responded that Ms. Mandsager would have to remain in Dr. Purkey's class and also "reminded Ms. Mandsager that Purkey was responsible for her grade in that class." Compl. ¶ 27.

On April 23, 1999, Dr. Borders called Ms. Mandsager and told her that Dr. Purkey would be notified of the formal complaint, that he would be reprimanded, and that a "round table" or remedial discussion would be held between Ms. Mandsager, Dr. Purkey, and a UNCG administrative official to discuss Dr. Purkey's conduct. The round table discussion took place on May 21, 1999 and consisted of the following: (1) Ms. Mandsager was instructed by Dr. Borders to sit at a table; (2) Dr. Borders and Dr. Purkey entered the room together and remained standing; (3) Dr. Purkey read a prepared statement from a note card; and (4) Dr. Purkey left the room. Ms. Mandsager met with Dr. Borders to discuss her dissatisfaction with the round table discussion and was told that Dr. Purkey had complied with UNCG's requirements.

Once Ms. Mandsager submitted the written complaint regarding Dr. Purkey's conduct, she experienced the following events: First, Ms. Mandsager was told that she could no longer serve as a teaching assistant "for obvious reasons" since Dr. Purkey was the supervisor of the teaching assistant program. Instead, Ms.

Mandsager was offered a position as a graduate assistant with fewer hours and less pay than she had enjoyed as a teaching assistant. Second, Ms. Mandsager was not allowed to continue working as a clinical supervisor "because everyone gets a chance" even though the CED was in need of additional clinical supervisors. Third, Ms. Mandsager was informed that the CED faculty had decided she would not be allowed to complete her educational research and methodology requirement as an independent study and that she would have to take the course and the research and statistics comprehensive exam in order to complete the program. Fourth, during one week in August 1999, three of four professors resigned from Ms. Mandsager's doctoral committee. Fifth, Dr. Borders told Ms. Mandsager that she may have to "re-take all of her comprehensive exams" before she could complete the PhD program. Sixth, Ms. Mandsager was denied a retroactive withdrawal from the educational research methodology course she had taken and was informed that the "incomplete" grade she had received following her diagnosis with a learning disability in mathematics would be changed to a grade of "failed." Seventh, Ms. Mandsager was told she would need to seek employment outside the CED for the Fall 1999 Semester. Finally, Dr. Borders admitted to Ms. Mandsager that the faculty members in the CED were uncomfortable having Ms. Mandsager in the program.

At this point, Ms. Mandsager sought help from Defendant Brad Bartel, the Dean of the Graduate School at UNCG. Dean Bartel initially told Ms. Mandsager that he would not be able to help her until he reviewed her psychological assessment. After reviewing her psychological assessment, Dean Bartel met with Ms. Mandsag-er on October 8, 1999. During this meeting Dean Bartel told Ms. Mandsager that when a graduate student files a sexual harassment complaint against a highly distinguished faculty member, she has made a decision between reporting the offense and obtaining her degree.[1] Dean Bartel suggested that Ms. Mandsager ask Dr. Nick Vacc, another CED faculty member to serve as a member of her doctoral committee. When Ms. Mandsager told Dean Bartel that she thought that would be demeaning because Dr. Vacc and Dr. Purkey were close friends, Dean Bartel responded, "Well, you're going to have to demean yourself one more time before I can help you." On January 4, 2000, Ms. Mandsager withdrew from the doctoral program at UNCG.

Ms. Mandsager filed a complaint with the EEOC and received a right to sue letter. Ms. Mandsager's complaint was originally filed in state court and then removed to this Court by the Defendants. [Doc. # 1] The first and fourth claims are brought against UNCG and the individual defendants in their official capacities pursuant to Title VII for a hostile employment environment and for employment retaliation. 42 U.S.C. § 2000e. Ms. Mandsager also alleges numerous violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* Specifically, the second claim seeks relief for a hostile working environment, the third claim seeks relief for a hostile educational environment, the fifth claim seeks relief for employment retaliation, and the sixth claim seeks relief for educational retaliation, each in violation of Title IX. The seventh claim for relief is brought only against the individual defendants in their individual capacities pursuant to 42 U.S.C. § 1983 and alleges viola-

---

**1.** Bartel also told Ms. Mandsager: "If two graduate students reported a rape to me, asked if they should pursue charges, for the sake of their degrees I would advise them to get the PhD."

tions of Ms. Mandsager's constitutional and statutory rights. The eighth and ninth claims for relief are brought against all defendants and seek relief for intentional and negligent infliction of emotional distress under North Carolina state law. In addition to compensatory and punitive damages, Ms. Mandsager also seeks injunctive relief in the form of an order enjoining the "unlawful employment and education practices" complained of, as well as in the form of reinstatement to the doctoral program at UNCG. The Defendants removed the case to this Court. [Doc. #1]. Before filing an answer, the Defendants moved to dismiss pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure.

## II.

The Defendants contend that Ms. Mandsager's federal claims should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A Rule 12(b)(6) motion should be granted only if, after accepting all wellpleaded allegations in the complaint as true, it appears certain that Ms. Mandsager cannot prove any set of facts in support of her claims that entitles her to relief. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir.1999). The complaint should not be dismissed unless it is certain that Ms. Mandsager is not entitled to relief under any legal theory that might plausibly be suggested by the facts alleged. *Mylan Labs. Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993). The Fourth Circuit has stated that "[u]nder the liberal rules of federal pleading, a complaint should survive a motion to dis-

miss if it sets out facts sufficient for the court to infer that all the required elements of the cause of action are present." *Wolman v. Tose*, 467 F.2d 29, 33 n. 5 (4th Cir.1972).

## A.

■ Ms. Mandsager brings this action against UNCG, Dr. Borders in her official capacity, and Dean Bartel in his official capacity for alleged violations of Title VII.[2] Title VII provides a cause of action for employees if "sexual harassment creates a hostile work environment or abusive atmosphere." *Smith v. First Un. Nat'l Bank*, 202 F.3d 234, 241 (4th Cir.2000). To prevail on a Title VII hostile work environment claim, an employee must establish four elements: (1) that she was harassed "because of" her "sex"; (2) that the harassment was unwelcome; (3) that the harassment was sufficiently pervasive or severe to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer. *Id.* at 241.

■ In this case, while the defendants dispute that Dr. Purkey's conduct was harassing, the defendants do not dispute that Dr. Purkey's conduct was directed toward Ms. Mandsager because of her sex or that it was unwelcome. The defendants assert that any conduct was not sufficiently pervasive or severe to create an abusive working environment. In determining whether the alleged conduct is sufficiently pervasive or severe, it is necessary to look at all the circumstances surrounding the employment and the harassment including

**2.** "Employees are not liable in their individual capacities for Title VII violations." *Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 178 (4th Cir.1998). However, Ms. Mandsager may bring a Title VII action against the individual defendants in their official capacities because lawsuits against government employees in their official capacities is "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (*quoting Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

<br/>

---

"(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or a mere offensive utterance; and (4) whether it unreasonably interferes with [the] employee's work performance." *Smith,* 202 F.3d at 242 (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

■ In this case, Ms. Mandsager's complaint states that while she was a graduate assistant in the UNCG Department of Education, Dr. Purkey "often" put his arm around Ms. Mandsager and called her "honey." The complaint also states that Dr. Purkey "periodically" corresponded with Ms. Mandsager about UNCG business and signed this correspondence "Affectionately, William" or "Love, William." In addition, Dr. Purkey sexually propositioned Ms. Mandsager. According to the language of the complaint, these were not isolated improper incidents. Ms. Mandsager alleges that Dr. Purkey's conduct toward her was degrading and humiliating. (Comp.¶ 33). Ms. Mandsager also alleges that Dr. Purkey's conduct interfered with her responsibilities as a research assistant and teaching assistant. (Comp.¶ 25.) At the 12(b)(6) stage, such allegations are sufficient to allege that the conduct was pervasive or severe. *See e.g. Conner v. R.H. Barringer Distribution Co.,* 152 F.Supp.2d 856, 860 (M.D.N.C.2001) (finding "two examples of harassing remarks and [a] physical encounter in which the co-worker kissed her on the ear" sufficient to withstand 12(b)(6) dismissal).

■ The final *Smith* factor requires that there be a basis for imputing liability to the employer. Generally, "employers are liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action" to stop the harassment. *Mikels v. City of Durham,* 183 F.3d 323, 332 (4th Cir.1999). In this case, the complaint alleges that Ms. Mandsager discussed Dr. Purkey's behavior with Dr. Borders on "numerous occasions" prior to the sexual proposition that led to the formal grievance. Thus, it is alleged that Dr. Borders, as the head of the CED department at UNCG, had actual knowledge of Dr. Purkey's conduct and took no steps whatsoever to stop the conduct. Furthermore, Dr. Borders' initial response to Ms. Mandsager's complaints, the statement that "William will be William," supports a reasonable inference that Dr. Borders was aware of prior inappropriate behavior. At this stage, Ms. Mandsager has alleged sufficient facts for the court to infer that all the required elements of the cause of action are present. The defendants' motion to dismiss the hostile work environment Title VII claim is DENIED.

B.

■ Title VII also makes it "an unlawful employment practice for an employer to discriminate against any of [its] employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). In order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove (1) that she engaged in a protected activity; (2) that an adverse employment action was taken against her; and (3) that there was a causal connection between the first two elements. *Dowe v. Total Action Against Poverty,* 145 F.3d 653, 656 (4th Cir.1998).

■ Ms. Mandsager has alleged facts sufficient to survive a motion to dismiss the retaliation claim. First, she engaged in a protected activity by filing a formal grievance against Dr. Purkey. In addition, Ms. Mandsager was originally employed by the CED as a research assistant and teaching assistant. Following the filing of the complaint, Ms. Mandsager was

informed that she could no longer serve as a teaching assistant and was offered a position as a graduate assistant with fewer hours and less pay than a teaching assistant. Ms. Mandsager also was not allowed to continue working as a clinical supervisor even though the CED was in need of additional clinical supervisors.

As to the causation element, Ms. Mandsager filed a written complaint against Dr. Purkey on March 31, 1999. The complaint filed in this case does not specify the date on which Ms. Mandsager was removed from her position as a teaching assistant, stating only that "Defendant Borders informed Mandsager that she would no longer be allowed to continue as a teaching assistant the next fall ...." Comp. ¶ 31. From this language, it can be inferred that Ms. Mandsager was removed from her teaching assistant position within the spring 1999 semester or at the very latest during the summer of 1999. Thus, Ms. Mandsager was removed from her teaching assistant position within three or four months of filing her complaint against Dr. Purkey. The Fourth Circuit has held that "very little evidence of a causal connection is required to establish a prima facie case" and "merely the closeness in time between the filing of a discrimination charge and an employer's firing an employee is sufficient" to satisfy the causation element of a prima facie retaliation case. *Tinsley v. First Union Nat. Bank*, 155 F.3d 435, 443 (4th Cir.1998). *Compare Williams v. Cerberonics, Inc.*, 871 F.2d 452 (4th Cir.1989) (holding three month time period between protected activity and termination sufficient to satisfy the causation element of the prima facie case of retaliation) *with Causey v. Balog*, 162 F.3d 795, 803 (4th Cir.1998) (finding that thirteen month interval between plaintiff's initial charge and termination too long to establish causation without additional evidence of retaliation).

At the 12(b)(6) stage, Ms. Mandsager has alleged sufficient facts to state a cause of action for retaliation under Title VII. The defendants' motion to dismiss the retaliation claim is DENIED.

### III.

▇ Ms. Mandsager also seeks relief pursuant to Title IX, which prohibits sex discrimination against students and employees of educational institutions that receive federal funds: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal funds." 20 U.S.C. § 1681(a). This statute carries an implied private right of action, *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and allows students to recover damages for discriminatory conduct engaged in by their professors. *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 75–76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Ms. Mandsager alleges four violations of Title IX: hostile work environment, hostile educational environment, employment retaliation, and educational retaliation.

### A.

The Fourth Circuit has held that the implied right of action for enforcement of Title IX extends to "employment discrimination on the basis of gender by education institutions receiving federal funds." *Preston v. Commonwealth of Virginia ex rel. New River Comm. College*, 31 F.3d 203, 206 (4th Cir.1994) (citing *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982)). The defendants assert that Ms. Mandsager's Title IX hostile environment claims should be dismissed because the complaint does not sufficiently allege the elements re-

quired to establish a hostile environment violation of Title IX.[3]

■ In *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277, (1998), the Supreme Court set out the factors that a student alleging sexual harassment by a school employee would have to show before the school could be liable under Title IX: (1) the student was subjected to quid pro quo sexual harassment or a sexually hostile environment; (2) the student provided actual notice of the situation to an official of the educational institution with authority "to address the alleged discrimination and to institute corrective measures"; and (3) the institution's response to the harassment was so inadequate that it amounted to "deliberate indifference." *Id.* at 290, 118 S.Ct. 1989.

■ The defendants contend that Ms. Mandsager's complaint does not state a claim for a Title IX hostile environment violation because she was not subject to a sexually hostile environment.[4] Despite the defendants' contention to the contrary, the complaint alleges that prior to the direct sexual proposition, Ms. Mandsager was subject to sexual comments and physical contact by Dr. Purkey. When she initially complained about this conduct, Dr. Borders simply replied, "William will be William." In addition, when Ms. Mandsager went to see Dean Bartel, he suggested to her that by making a complaint against a highly regarded faculty member she had chosen not to receive her PhD. Allegations of Dr. Purkey's conduct, Dr. Borders' response to the initial complaints, and Dean Bartel's response to the complaints sufficiently state a sexually hostile environment in violation of Title IX.

The defendants assert there is no Title IX liability because the response to Ms. Mandsager's complaints about Dr. Purkey was not clearly unreasonable and did not amount to deliberate indifference. In the complaint, Ms. Mandsager alleges that she complained to Dr. Borders about Dr. Purkey's conduct on "numerous occasions." There is no evidence that Dr. Borders did anything in response to these initial complaints. Furthermore, the sexual proposition, which Dr. Purkey has admitted, occurred after Ms. Mandsager complained to Dr. Borders. Once evidence is available at a later stage in this proceeding, it may be found that UNCG's response was not "clearly unreasonable," but such a finding is not mandated from the allegations in the complaint alone. The defendants' motion to dismiss the Title IX hostile environment claims is DENIED.

**B.**

■ Ms. Mandsager has also alleged retaliation claims in violation of Title IX. The Fourth Circuit has held that "[r]etaliation against an employee for filing a claim of gender discrimination is prohibited under Title IX." *Preston*, 31 F.3d at 206. While neither the Supreme Court nor the Fourth Circuit have explicitly held that Title VII standards and jurisprudence are applicable to Title IX claims made by students, the Supreme Court has stated that Title IX should be given "a sweep as broad as its language." *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). In addition, the Fourth Circuit has stated that Title VII jurisprudence "provide[s] a persuasive body of standards to which we may look in shaping the contours of a private right of

---

**3.** The elements of a hostile environment claim under Title IX are the same whether the claim is characterized as a hostile working environment or a hostile educational environment.

**4.** UNCG does not dispute that Dr. Borders was an appropriate person under the second element of a Title IX cause of action.

action under Title IX." *Preston,* 31 F.3d at 207. As discussed above, *see* III. B, Ms. Mandsager has alleged sufficient facts to state a claim for retaliation under Title VII. The defendants' motion to dismiss the Title IX retaliation claims is DENIED.

### IV.

Ms. Mandsager has also alleged a cause of action against Dr. Borders and Dean Bartel in their individual capacities pursuant to 42 U.S.C. § 1983.

### A.

■■ Dr. Borders and Dean Bartel assert that, despite the individual capacity caption in the complaint, the § 1983 claims are actually against them in their official capacity and are barred by the Eleventh Amendment. In support of their argument, the defendants cite *Cowan v. University of Louisville Sch. of Medicine,* 900 F.2d 936 (6th Cir.1990). In *Cowan,* the Sixth Circuit affirmed the dismissal of a § 1983 action against state officials in their personal capacity on the basis that the "capacity in which the individual defendants were in fact acting is what matters, not the capacity in which they were sued." *Id.* at 942.[5] The Supreme Court, however, has specifically rejected the assertion that "state officials may not be held liable in their personal capacity for actions they take in their official capacity." *Hafer v. Melo.* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

In *Hafer,* the Supreme Court abrogated *Cowan,* stating, "we find it both unpersuasive as an interpretation of § 1983 and foreclosed by our prior decisions." *Id.* at 27, 112 S.Ct. 358.[6] The *Hafer* court also rejected a distinction between conduct "outside the official's authority or not essential to the operation of state government, and those both within the official's authority and necessary to the performance of governmental functions" because, the Court found, such a distinction would "absolutely immunize state officials from personal liability for acts within their authority and necessary to fulfilling governmental responsibilities." *Id.* at 28, 112 S.Ct. 358. The Court explained that absolute immunity from suit was available only to a "limited class of officials, including the President of the United States, legislators carrying out their legislative functions, and judges carrying out their judicial functions." *Id.* at 29, 112 S.Ct. 358. In her § 1983 claim, Ms. Mandsager seeks damages against Dr. Borders and Dean Bartel in their individual capacities for actions they committed that Ms. Mandsager has alleged violate her constitutionally protected rights. Any judgment awarded against these defendants would be their personal responsibility.

### B.

■■ Dr. Borders and Dean Bartel also argue that the § 1983 claims against them should be dismissed because the claims are preempted by Title VII and Title IX. The Fourth Circuit has recently reiterated that Title VII does not preempt § 1983 claims. *Booth v. Maryland,* 327 F.3d 377 (4th Cir.

---

**5.** The Sixth Circuit's decision was based on its interpretation of *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45, (1989), in which the Court said, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Id.* at 71, 109 S.Ct. 2304.

**6.** In *Hafer,* the Court clarified the statement in *Will:* "the claims considered in *Will* were

official-capacity claims; the phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury. To the extent that *Will* allows the construction [in *Cowan*], however, we now eliminate that ambiguity." *Hafer,* at 26–27, 112 S.Ct. 358.

2003). The Fourth Circuit explained that a plaintiff can pursue a § 1983 cause of action, in conjunction with a Title VII action, when the § 1983 claim is based on a deprivation of a constitutional right, such as the Equal Protection Clause of the Fourteenth Amendment. *See Keller v. Prince George's County,* 827 F.2d 952, 963 (4th Cir.1987) (conducting a thorough analysis of the legislative history of the 1972 amendments to the civil rights acts and concluding that Title VII does not preempt the "remedy available for a violation of the fourteenth amendment for intentional employment discrimination provided by § 1983"). The Fourth Circuit has also held that intentional sexual harassment of a public employee by a supervisor constitutes gender discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment and is actionable under § 1983. *See Beardsley v. Webb,* 30 F.3d 524, 529 (4th Cir.1994). Ms. Mandsager has alleged a violation of her constitutionally protected right to be free from sexual harassment. Thus, Ms. Mandsager is not precluded from asserting a § 1983 claim against the individual defendants on the grounds that such a claim is preempted by Title VII.

As to Title IX, the Fourth Circuit has not expressly held whether a § 1983 claim is preempted by Title IX. However, the majority of circuits that have addressed the issue have found that § 1983 is not preempted by Title IX. *See Crawford v. Davis,* 109 F.3d 1281, 1284 (8th Cir.1997) (holding that Title IX does not contain a sufficiently comprehensive remedial scheme to "foreclose the use of § 1983 to redress violations of Title IX"); *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 722–24 (6th Cir.1996) (rejecting defendants' argument that § 1983 is subsumed in Title IX); *Seamons v. Snow,* 84 F.3d 1226, 1233–34 (10th Cir.1996) (concluding that the plaintiff's " § 1983 action is not barred by Title IX"); *but see Boulahanis*

*v. Board of Regents,* 198 F.3d 633, 640 (7th Cir.1999) (holding Title IX preempts sex discrimination claims against university and university officials under § 1983, even though Title IX does not allow for suits against individual defendants); *Pfeiffer v. Marion Center Area School Dist.,* 917 F.2d 779, 789 (3d Cir.1990) (holding that § 1983 claims are "subsumed" by Title IX). We will follow the majority of circuits that have addressed the issue and find that Ms. Mandsager is not precluded from asserting a § 1983 claim against the individual defendants on the grounds that such a claim is preempted by Title IX.

### C.

 Dr. Borders and Dean Bartel also argue the § 1983 claims against them should be dismissed on the basis of qualified immunity. Qualified immunity protects government officials from liability under § 1983 so long as the conduct of the official "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To evaluate a claim of qualified immunity, it is necessary to determine whether the plaintiff has alleged the deprivation of an actual constitutional right, and then determine whether that right was "clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

 The first question is whether Ms. Mandsager has alleged a deprivation of an actual constitutional right. The Supreme Court has held that "[t]he equal protection clause confers a right to be free from gender discrimination that is not substantially related to important governmental objectives." *Davis v. Passman,* 442 U.S. 228, 234–35, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). Applying this precedent "courts

have held that intentional sexual harassment of employees by persons acting under color of state law violates the Fourteenth Amendment and is actionable under § 1983," *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir.1994) (citing *Pontarelli v. Stone*, 930 F.2d 104, 113–14 (1st Cir.1991)). As discussed in detail above, Ms. Mandsager has alleged facts that could support a violation of her right to be free from sexual harassment.

Next, it must be determined if this right was a "clearly established statutory or constitutional right of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The defendants do not dispute that the right to be free from sexual harassment is a clearly established right.

■■■ Since Ms. Mandsager's allegations are consistent with the violation of a constitutional right that was clearly established at the time of Defendants' alleged misconduct, the final step in the qualified immunity analysis is to determine whether a reasonable official would have understood that the alleged misconduct violated those rights. *E.g., Trulock v. Freeh*, 275 F.3d 391, 400 (4th Cir.2001). However, if the analysis reaches this stage, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727 (1982). Although the defendants dispute that Ms. Mandsager has alleged sufficient facts to support a hostile environment claim, the defendants do not dispute that a reasonable official would have understood that sexual harassment would violate a clearly established right. The defendants are not entitled to qualified immunity.

## D.

At this point, it is necessary to determine whether Ms. Mandsager has alleged

sufficient facts to withstand the motion to dismiss the § 1983 claims pursuant to Rule 12(b)(6). The Supreme Court has held that "to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114(1985). In addition to personal liability for his conduct, an individual may be subject to supervisory liability under § 1983.

### 1.

The Fourth Circuit has held that supervisory liability may exist under § 1983 if a plaintiff can establish three elements: (1) "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) "that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices' "; and (3) "that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994).

■■■ Under the first element of *Shaw*, the conduct engaged in by the subordinate must be "widespread, or at least has been used on several different occasions." *Id.* The requirement of "widespread" misconduct was stated in the context of a supervisor having ample opportunity for notice that the conduct was ongoing. *See Slakan v. Porter*, 737 F.2d 368, 378 (4th Cir.1984). According to the complaint in this case, however, there is not a question of whether the supervisor had notice of the conduct. Ms. Mandsager alleges that she spoke to Dr. Borders on "numerous occasions" regarding Dr. Purkey's conduct. Specifically, Ms.

Mandsager alleges that she told Dean Borders that Dr. Purkey "often" put his arm around her and called her "honey" and that he "periodically" corresponded with her about UNCG business and signed this correspondence "Affectionately, William" or "Love, William." Thus, Dr. Borders had actual notice of allegations that one of her subordinates was engaged in conduct that constituted a risk of constitutional injury.

■ Second, *Shaw's* "deliberate indifference" requirement may be satisfied by showing "[a] supervisor's continued inaction in the face of documented widespread abuses." *Shaw,* 13 F.3d at 799, *See also Randall v. Prince George's County,* 302 F.3d 188 (4th Cir.2002). As noted previously, the complaint alleges that Ms. Mandsager discussed Dr. Purkey's behavior with Dr. Borders on "numerous occasions" prior to the sexual proposition that led to the formal grievance. Dr. Borders took no steps whatsoever to stop the conduct. Furthermore, Dr. Borders' initial response to Ms. Mandsager's complaints, the statement that "William will be William," implies that Dr. Borders was aware that Dr. Purkey may have engaged in inappropriate behavior prior to Ms. Mandsager's complaints.

Finally, Ms. Mandsager has alleged that she made complaints to Dr. Borders about Dr. Purkey's conduct on "numerous occasions." There is no evidence that Dr. Borders took any action in response to these complaints. Dr. Purkey sexually propositioned Ms. Mandsager after she made complaints to Dr. Borders. For purposes of a motion to dismiss pursuant to Rule 12(b)(6), Ms. Mandsager has alleged facts sufficient to support an inference "that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." As to Dr. Borders, Ms. Mandsager has pled facts sufficient to de-feat a motion to dismiss. Dr. Border's motion to dismiss is DENIED.

2.

■ As to Dean Bartel, however, Ms. Mandsager has not pled any facts to support a finding that Dean Bartel could be liable as a supervisor under § 1983. Ms. Mandsager went to see Dean Bartel *after* Dr. Purkey sexually propositioned her. There is nothing in the complaint to suggest that Dr. Purkey committed any offensive acts toward Ms. Mandsager after she went to see Dean Bartel. Thus, Ms. Mandsager has not alleged facts to satisfy the third *Shaw* factor, which requires a causal link between Dean Bartel's conduct as a supervisor and a constitutional injury committed by one of Dean Bartel's subordinates.

■ Because Ms. Mandsager cannot establish that Dean Bartel is liable under § 1983 on a supervisory liability theory, it is necessary to consider whether Ms. Mandsager can establish that Dean Bartel committed a *direct* violation of her constitutional rights. The standards developed for hostile work environment claims under Title VII apply to claims for sexual harassment under section 1983. *Beardsley v. Webb,* 30 F.3d 524, 529 (4th Cir.1994); *see also Gairola v. Commonwealth of Va. Dept. of Gen. Servs.,* 753 F.2d 1281, 1285 (4th Cir.1985). The elements of a hostile work environment claim are: (1) that the plaintiff was harassed "because of" her "sex"; (2) that the harassment was unwelcome; (3) that the harassment was sufficiently pervasive or severe to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer. *Smith v. First Un. Nat'l Bank,* 202 F.3d 234, 241 (4th Cir.2000). In determining whether the alleged conduct is sufficiently pervasive or severe, it is necessary to look at all the circumstances surrounding the

employment and the harassment including "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or a mere offensive utterance; and (4) whether it unreasonably interferes with [the] employee's work performance." *Smith,* 202 F.3d at 242 (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

■ During their October 1999 meeting, Dean Bartel told Ms. Mandsager that when a graduate student files a sexual harassment complaint against a highly distinguished faculty member, she has made a decision between reporting the offense and obtaining her degree.[7] Dean Bartel also suggested that Ms. Mandsager ask Dr. Vacc, another CED faculty member, to serve as a member of her doctoral committee. When Ms. Mandsager told Dean Bartel that she thought that would be demeaning because Dr. Vacc and Dr. Purkey were close friends, Dean Bartel responded, "Well, you're going to have to demean yourself one more time before I can help you." The complaint alleges that Dean Bartel's statements occurred during one meeting in October 1999. Although the statements may be reprehensible, it does not appear, from the face of the complaint, that the statements were uttered with the pervasiveness required to establish a § 1983 violation. Dean Bartel's motion to dismiss the § 1983 claim is GRANTED.

## V.

Ms. Mandsager also seeks relief for negligent infliction of emotional distress and intentional infliction of emotional distress under North Carolina state law.

## A.

■ UNCG has moved to dismiss these state-law claims filed on the basis of Eleventh Amendment immunity. The individual defendants have also moved to dismiss these claims on the basis that they have been sued in their official capacities and as such are entitled to Eleventh Amendment immunity. *See Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 106 and 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (concluding that "a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment"). In this case, the original complaint was filed in the Superior Court Division of the General Court of Justice in Guilford County, North Carolina. The defendants removed the case to federal court on the grounds of federal question jurisdiction. [Doc. # 1]. The United States Supreme Court has recently considered "whether a State waives [Eleventh Amendment] immunity when it removes a case from state court to federal court." *Lapides v. Board of Regents of University System of Georgia,* 535 U.S. 613, 619, 122 S.Ct. 1640, 152 ·L.Ed.2d 806 (2002). A unanimous Supreme Court concluded that the state's voluntary removal "to federal court waived its Eleventh Amendment immunity." *Id.* at 624, 122 S.Ct. 1640. The defendants' motion to dismiss on the grounds of Eleventh Amendment immunity is DENIED.

■ In addition, UNCG asserts that it is entitled to dismissal on the basis of sovereign immunity. The doctrine of sovereign immunity protects the State and its agencies from suit absent waiver or consent. *Guthrie v. North Carolina State Ports Authority,* 307 N.C. 522, 299 S.E.2d

---

**7.** Bartel told Ms. Mandsager: "If two graduate students reported a rape to me, asked if they should pursue charges, for the sake of their degrees I would advise them to get the PhD."

618, 625 (1983). UNCG, as a state university, is a state agency to which the doctrine of sovereign immunity applies. *Kawai America Corp. v. University of North Carolina,* 152 N.C.App. 163, 567 S.E.2d 215, 217 (2002). In suits against governmental agencies, the complaint must specifically allege a waiver of sovereign immunity. *Dalenko v. Wake County Dept. of Human Services,* 578 S.E.2d 599, 603 (N.C.App. 2003). In this case, Ms. Mandsager has alleged that UNCG has waived sovereign immunity through the purchase of insurance. Comp. ¶ 4. At a later date, it may be determined that UNCG has not waived its sovereign immunity. However, for purposes of a motion to dismiss pursuant to Rule 12(b)(6), Ms. Mandsager has sufficiently alleged that UNCG has waived its sovereign immunity. UNCG's motion to dismiss on the grounds of sovereign immunity is DENIED.

### B.

■ As to the individual defendants, the North Carolina Supreme Court has established a process for determining whether a plaintiff may obtain relief for state law claims against a defendant who is a state employee. *Meyer v. Walls,* 347 N.C. 97, 489 S.E.2d 880 (1997). The first step in the process requires a determination of whether the defendant is being sued in his official capacity, his individual capacity, or both. If an individual is sued in his official capacity, he is entitled to defenses available to the state such as Eleventh Amendment immunity and sovereign immunity. *Whitaker v. Clark,* 109 N.C.App. 379, 427 S.E.2d 142, 143–44 (1993).

■ If, on the other hand, an individual is sued in his individual capacity, he may be entitled to the defense of public official immunity. Under the doctrine of public official immunity, "public officials engaged in the performance of their governmental duties involving the exercise of judgment and discretion, and acting within the scope of their authority, may not be held liable for such actions, in the absence of malice or corruption." *Price v. Davis,* 132 N.C.App. 556, 512 S.E.2d 783, 787 (1999). Public official immunity is not a defense to intentional torts. *Wells v. North Carolina Dept. of Correction,* 152 N.C.App. 307, 567 S.E.2d 803, 813 (2002).

■ The North Carolina Supreme Court has adopted the following test for determining whether an individual is sued in his official capacity or his individual capacity:

The crucial question for determining whether a defendant is sued in an individual or official capacity is the nature of the relief sought, not the nature of the act or omission alleged. If the plaintiff seeks an injunction requiring the defendant to take an action involving the exercise of a governmental power, the defendant is named in an official capacity. If money damages are sought, the court must ascertain whether the complaint indicates that the damages are sought from the government or from the pocket of the individual defendant. If the former, it is an official-capacity claim; if the latter, it is an individual-capacity claim; and if it is both, then the claims proceed in both capacities.

■ *See Meyer v. Walls,* 347 N.C. 97, 489 S.E.2d 880 (1997) (quoting Anita R. Brown Graham & Jeffrey S. Koeze, Immunity from Personal Liability under State Law for Public Officials and Employees: An Update, Loc. Gov't L. Bull. 67 (Inst. of Gov't, Univ. of N.C. at Chapel Hill Apr. 1995, at 7)). In addition, although not a determinative factor, a court may consider the caption of the complaint to determine the capacity in which an individual has been sued. *See Wells v. North Carolina Department of Correction,* 152 N.C.App. 307, 567 S.E.2d 803, 813 (2002) (noting that

in the "caption of her complaint, plaintiff designated that [the defendants] were being sued in both their official and individual capacities").

In the emotional distress claims for relief, Ms. Mandsager asserts that she has "suffered damages in an amount in excess of $10,000." Comp. ¶ 21. There is no indication in this claim for relief whether Ms. Mandsager seeks damages from the government or the individuals. In the caption of this action, Ms. Mandsager names Dr. Borders and Dean Bartel in their official and individual capacities. For the Title VII and Title IX claims, Ms. Mandsager specifically asserts that Dr. Borders and Dean Bartel are being sued in their official capacities. For the § 1983 claims, Ms. Mandsager asserts that Dr. Borders and Dean Bartel are being sued in their individual capacities. However, on the emotional distress claims, Ms. Mandsager seeks relief from "All Defendants." According to the caption, "All Defendants" would include UNCG, Dr. Borders in her official and individual capacities, and Dean Bartel in his official and individual capacities. Because Ms. Mandsager seeks money damages from "All Defendants," the Court concludes that Dr. Borders and Dean Bartel have been sued in both their individual and official capacities for purposes of the emotional distress claims.

The defendants assert that the official capacity claims must be dismissed on the grounds of Eleventh Amendment immunity and sovereign immunity. For the reasons discussed above, see IV.A, Dr. Borders and Dean Bartel's motion to dismiss on these grounds in DENIED.

As to individual capacity, Dr. Borders and Dean Bartel may be immune from suit on the basis of public official immunity. Under North Carolina law, it is well-established that public official immunity is an affirmative defense. *Burwell v. Giant Genie Corp.*, 115 N.C.App. 680, 684, 446 S.E.2d 126, 128–29 (1994). At the 12(b)(6) stage, only the allegations in the well-pleaded complaint may be considered. The complaint does not provide sufficient information for a determination of whether Dr. Borders and Dean Bartel would be considered public officials for purposes of the doctrine of public official immunity. The determination of whether the individual defendants are entitled to public official immunity may be considered at the summary judgment stage.

### C.

Finally, UNCG and the individual defendants assert that Ms. Mandsager's emotional distress claims should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief could be granted. In North Carolina, the tort of intentional infliction of emotional distress ("IIED") consists of three elements: (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another. *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981). A claim for IIED exists when a defendant's conduct far exceeds the bounds of decency and is regarded as atrocious and utterly intolerable in society. *Watson v. Dixon*, 130 N.C.App. 47, 502 S.E.2d 15, 19–20 (1998).

To establish a claim for negligent infliction of emotional distress ("NIED") in North Carolina, a plaintiff must present evidence to create a reasonable inference that (1) the defendant negligently engaged in conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiff to suffer severe emotional distress; and (3) the conduct did in fact cause the plaintiff to suffer severe emotional distress. *Best v. Duke Univ.*, 337 N.C. 742, 448 S.E.2d 506, 511 (1994).

Both IIED and NIED require that the plaintiff suffer from severe emotional dis-

tress. The North Carolina Court of Appeals has defined severe emotional distress as "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Soderlund v. Kuch,* 143 N.C.App. 361, 546 S.E.2d 632, 637 (2001).

■ In the complaint, Ms. Mandsager has alleged sufficient facts to support a claim of either IIED or NIED. As discussed in detail above, Ms. Mandsager has alleged facts that support an inference that the defendants' response to her complaints about Dr. Purkey's conduct was extreme and outrageous. Ms. Mandsager has also alleged that the defendants knew or should have known that their conduct would result in severe emotional distress. Finally, Ms. Mandsager has alleged that she has suffered severe emotional distress requiring medical treatment. For purposes of 12(b)(6), these allegations are sufficient to state a claim for either IIED or NIED. The defendants' motions to dismiss for failure to state a claim are DENIED.

## VI.

For the reasons stated above, UNCG's motion to dismiss is DENIED in its entirety. Dean Bartel's motion to dismiss the § 1983 claim against him in his individual capacity is GRANTED. The motion to dismiss on the remaining grounds is DENIED. With the exception of the § 1983 claim against Dean Bartel, all of the other claims in the complaint remain.

## ORDER

This matter is before the Court on Defendants' Motions to Dismiss pursuant Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure [Docs. # 7, 9]. For the reasons stated in a contemporaneously filed Memorandum Opinion, the Defendants' motions are GRANTED IN PART and DENIED IN PART.