Carolyn DAVIS, Plaintiff,

v.

**DURHAM MENTAL HEALTH DEVEL- OPMENTAL DISABILITIES SUB- STANCE ABUSE AREA AUTHORI- TY, d.b.a. and a.k.a. The Durham Mental Health Center, et al., Defendants.**

**No. 1:03 CV 273.**

United States District Court, M.D. North Carolina.

June 1, 2004.

Karen Frasier Alston, Janet Juanita Lennon, Frasier & Alston, P.A., Durham, NC, for Plaintiff.

Lucy Chavis, S.C. Kitchen, Curtis O. Massey, II, Durham County Attorney's Office, Durham, NC, for Defendants.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

OSTEEN, District Judge.

Plaintiff Carolyn Davis, a former employee at the Durham Mental Health Developmental Disabilities Substance Abuse Area Authority ("the Durham Center"), has sued the Durham Center and other defendants, alleging race and color discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); age discrimination and retaliation under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq.; a violation of Plaintiff's First Amendment rights; race discrimination and retaliation under 42 U.S.C. § 1981; and a violation of the North Carolina Whistleblower Act, N.C. GEN. STAT. § 126–84 et seq.[1] Defendants have filed motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim under Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure [pleading nos. 4–1, 6–1, 8–1, 10–1], and Defendants' motions have been referred to the undersigned.[2] Plaintiff has also filed a motion to amend her Amended Complaint [pleading no. 17–1], and that motion is also before the court. The par-

---

[1] Under the "Fourth Cause of Action" in the Amended Complaint, Plaintiff alleges vaguely that "the aforementioned suspension and termination actions of the defendants constitute whistleblower retaliation." *See* Amended Compl. ¶ 26. Plaintiff provides no statutory reference to the "whistleblower retaliation" claim. Thus, it is unclear by merely examining the pleadings whether Plaintiff alleges a federal or state whistleblower retaliation claim. In a brief supporting her motion to amend the Amended Complaint, however, Plaintiff indicates that she has alleged a violation of the North Carolina Whistleblower Act. *See* Pl. Br. Reply to D. Black's Opp. P.'s Mot. Amend, at 6.

[2] Defendants Batiste and Black have alternatively requested summary judgment pursuant to Federal Rule of Civil Procedure 56 [pleading no. 8–1].

ties have filed responsive pleadings and this matter is ripe for disposition. Since there has been no consent, I must address the motions by way of a recommended disposition.

## FACTS

Defendant Durham Center is a mental health area authority, created pursuant to Article 4 of North Carolina's Mental Health, Developmental Disabilities, and Substance Abuse Act of 1985 ("the Act"), N.C. GEN. STAT. §§ 122C–2 to 122C–433. The Durham Center provides community based mental health, developmental, and substance abuse services within the Durham County area. *See* Compl. ¶ 16(a). The Amended Complaint alleges that Plaintiff Carolyn Davis, an African–American woman of brown skin color who at all relevant times was at least forty years old, worked at the Durham Center for 24 years, beginning in 1977, until she was fired in August 2002. According to Plaintiff, she advanced without incident until February 2002, when the acting Area Director resigned, leaving the Area Director position vacant. At that time, Plaintiff was employed as the Durham Center's Deputy Area Director, and she alleges that she applied for and was interviewed for a promotion to fill the vacancy left by the Area Director. *See* Amended Compl. ¶¶ 4, 17(b).

On or about April 1, 2002, the Durham Center selected Ellen Holliman, a white non-employee, to serve as the center's Interim Area Director. *See* Amended Compl. ¶ 17(c), (d). Holliman's employment agreement stated that she would serve as the Interim Area Director until March 31, 2003, while the Durham Center was seeking a permanent Area Director. Plaintiff has alleged that Holliman has since been appointed to the permanent Area Director position, and Holliman has not denied that she is now serving as the Durham Center's Area Director. *See* Br. Supp. Mot. Dismiss by Holliman.

Plaintiff alleges that on or around April 18, 2002, she complained to the Durham Center that the center had discriminated against her in failing to select her for the Interim Area Director position. *See* Amended Compl. ¶ 17(g). Furthermore, on or about August 5, 2002, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging race and age discrimination in failure to promote her.[3] On August 8, 2002, Defendant Holliman, while acting as the Interim Area Director, placed Plaintiff on "suspended with pay" status, and on August 28, 2002, Defendant Holliman fired Plaintiff, citing alleged misconduct by Plaintiff at a board meeting. *See* Amended Compl. ¶ 17(j). On March 26, 2003, Plaintiff filed a Complaint in this court, alleging (1) race and color discrimination and retaliation under Title VII and 42 U.S.C. § 1981; (2) age discrimination and retaliation under the ADEA; (3) violations of Plaintiff's First Amendment rights; (4) and "[w]histleblower retaliation" under North Carolina's Whistleblower Act. Plaintiff filed an Amended Complaint on July 1, 2003. The named Defendants include Durham County; the Durham Center; the Durham Center's Area Board; Jackye Knight in her official capacity as Durham County's Director of Human Resources; Ellen Holliman in her official capacity as the Durham Center's Area Director; MaryAnn E. Black in her official capacity as a Durham County Commissioner and Area Board member; and Harold Batiste, Nancye

---

**3.** The EEOC issued a Right to Sue letter on December 27, 2002. *See* Notice of Right to Sue, Charge # 141A200688. Plaintiff also filed a separate EEOC charge based on the alleged retaliatory firing in August 2002, and the EEOC issued a Right to Sue letter as to that charge on May 15, 2003. *See* Notice of Right to Sue, Charge # 141–2003–00009.

Bryan, Karen Crumbliss, Phillip Golden, Terrance McCabe, Thomas Owen, Douglas Wright, and Hugh Wright, Jr., in their official capacities as Area Board members.

In support of her various claims, Plaintiff maintains that, in failing to promote her and in firing her, the Durham Center violated personnel policies and procedures, wasted public funds, and discriminated and retaliated against her because of her race, color, and age. *See* Amended Compl. ¶ 17(c), (d). In addition, Plaintiff contends that she was treated differently from the other applicants for the Interim Area Director position, who were all white, in the following manner: the Durham Center's Area Board asked the white applicants a set of written questions during their interviews but did not ask Plaintiff the same set of written questions during her interview; the Board sent written notification to the white applicants not selected for the position but the Board did not send Plaintiff written notification of her nonselection; and Defendant Holliman was hired at a salary higher than the amount that the Durham Center was willing to pay Plaintiff even though Holliman lacked Plaintiff's education and knowledge of the Durham Center and the community served by the center. *See* Amended Compl. ¶ 17(c), (d). Finally, Plaintiff alleges that she was asked "age related questions during her interview" and that white employees "have not been disciplined or terminated under circumstances similar to that of Plaintiff." *See* Amended Compl. ¶ 17(m). Plaintiff alleges that Durham County, the Durham Center, and the Area Board have waived sovereign immunity through the purchase of liability insurance, and she seeks declaratory relief, injunctive relief, and compensatory and punitive damages. *See* Amended Compl. ¶¶ 13, 14.

Defendants have now filed various motions to dismiss Plaintiff's claims under Rules 12(b)(1), (12)(b)(2), and (12)(b)(6) of the Federal Rules of Civil Procedure based on (1) lack of jurisdiction under the *Rooker–Feldman* doctrine; (2) Eleventh Amendment immunity as to Defendant Durham Center (3) the affirmative defense of res judicata based on Plaintiff's two previously filed state court lawsuits, which arose out of her non-promotion to the Interim Area Director position; and (4) failure to state a claim on which relief may be granted. Before turning to the merits of Plaintiff's claims, I will first address Defendants' arguments as to *Rooker–Feldman*, res judicata, and Eleventh Amendment sovereign immunity.

*Plaintiff's Previously Filed State Court and State Administrative Proceedings*

In addition to filing this lawsuit, Plaintiff also initiated state court and administrative proceedings arising out of Plaintiff's failure to be promoted to the position of Interim Area Director and out of Defendants' alleged retaliatory suspension and firing of Plaintiff. I will discuss these proceedings before turning to the merits of Plaintiff's claims since these prior proceedings are related to Defendants' res judicata and *Rooker–Feldman* arguments.

On May 2, 2002, Plaintiff filed two separate lawsuits in Durham County Superior Court. The defendants named in the state court lawsuits included all defendants named in this suit, plus additional defendants not named in this suit.[4] In the first state court lawsuit, bearing case number

---

4. The additional defendants in the state court lawsuits were individual Area Board members not named in this suit. Furthermore, in the state court lawsuits, Plaintiff sued the individual defendants in their individual and official capacities, whereas here Plaintiff has sued the individual defendants in their official capacities only, although she has now requested the court to allow her to amend her complaint for a second time to sue three of the defendants in their individual capacities.

02CVS3232 and hereinafter referred to as the "negligence lawsuit," Plaintiff sued Durham County; Jackye Knight in her individual and official capacity as the Director of Human Resources for Durham County; the Durham Center; and sixteen of the Durham Center's Area Board members in their individual and official capacities. Plaintiff alleged that the defendants were negligent in failing to comply with state and local personnel hiring requirements when selecting an Area Director and that they wasted public funds in the process.[5] Plaintiff contended, for instance, that when filling the Area Director position, Defendants did not follow internal and external posting requirements, did not follow internal recruitment preferences, did not form a search committee, and did not establish a recruitment period and a closing date. Plaintiff requested compensatory damages, including lost wages. She also requested that the court nullify Holliman's appointment to the Interim Area Director position. On August 14, 2002, the Durham County Superior Court dismissed Plaintiff's negligence lawsuit with prejudice as to the Durham Center and Jackye Knight and dismissed the action without prejudice as to the remaining defendants, finding that Plaintiff had not exhausted her administrative remedies as to those defendants. On September 11, 2002, Plaintiff filed a notice to appeal the state court's dismissal, but she subsequently withdrew her appeal.

In Plaintiff's second state court lawsuit, bearing case number 02CV2211 and hereinafter referred to as the "open meetings" lawsuit, Plaintiff filed a declaratory judgment action against the Durham Center. Plaintiff alleged that the Durham Center's Area Board conducted several closed sessions in violation of North Carolina's Open Meetings Law when selecting an Interim Area Director, and Plaintiff again asked the court to nullify Holliman's appointment. See N.C. GEN. STAT. § 143–318.10 et seq. (North Carolina's Open Meetings Law). On August 15, 2002, the Durham County Superior Court dismissed Plaintiff's open meetings lawsuit, finding that the Durham Center had not violated North Carolina's Open Meetings Law. See Order and Judgment, Durham County Superior Court, 02CV02211. In a separate written order, the court also entered Rule 11 sanctions against Plaintiff, concluding that Plaintiff had filed the open meetings lawsuit "for an improper purpose, in retaliation for the Defendant's failure to appoint her to the position of Interim Area Director and for leverage in trying to obtain a settlement from Defendant for that personnel action."[6] See Order and Judgment, Durham County Superior Court, 02CV02211.

In addition to filing the negligence and open meetings lawsuits in state court, Plaintiff also filed three petitions for contested case hearings with the North Carolina Office of Administrative Hearings ("OAH") based on her non-promotion, sus-

---

5. Specifically, Plaintiff contended (1) that Defendants violated local hiring procedural requirements as set forth in the Durham County's Personnel Ordinance, the Durham County Recruitment and Selection Administrative Procedure, and the Durham County Appointment Policy, and (2) that Defendants violated state hiring procedural requirements as set forth in North Carolina General Statutes §§ 122(c) et seq. and 126 et seq.

6. As a sanction, the court dismissed Plaintiff's Complaint and ordered Plaintiff to pay the Durham Center's costs and attorneys' fees. According to Defendants, Plaintiff's appeal in the open meetings lawsuit is now pending in the North Carolina Court of Appeals. See Br. Supp. Mot. Dismiss by Defs. Durham Center, Area Board, and Area Board members Nancye Bryan, Karen Crumbliss, Phillip Golden, Terrance McCabe, Thomas Owens, Douglas Wright, and Hugh Wright, at 3.

pension, and termination. In Plaintiff's first petition for a contested case hearing, filed on June 12, 2002, Plaintiff alleged that the Durham Center wrongfully denied her a promotion by (1) failing to give Plaintiff priority consideration for the Interim Area Director position; (2) violating the Durham Center's personnel hiring procedures when filling the position; and (3) discriminating against Plaintiff based on her race, age, and color. *See* Petition for Contested Hearing 02OSP1001. In a Final Decision dated August 6, 2003, an administrative law judge ("ALJ") dismissed Plaintiff's claims. The ALJ found that a preponderance of the evidence proved that Petitioner believed she "didn't have to go through a formal procedure" to become the Interim Area Director and that she therefore never formally applied for the position. According to the ALJ, Plaintiff informally let the Area Board members know she was interested in the position, but she stopped pursuing the position when she found out that the Durham Center was not willing to meet her salary requirements. *See* Final Decision, Petition for Contested Hearing, 02OSP1001, Findings of Fact, ¶ 32(b). The ALJ noted that, after losing interest in the position, Plaintiff sent the Durham Center staff an e-mail on February 19, 2002, stating, "Those of you interested in the job shall let your desire be known. I stand ready and willing to work for you." According to the ALJ, "[a] preponderance of the evidence proved that [Plaintiff] did not apply for the Interim Area Director position ... and therefore, [Plaintiff] could not claim that she suffered injury for not being hired for that position." *See* Final Decision, Petition for Contested Hearing, 02OSP1001, Findings of Fact, ¶ 36. The ALJ concluded that Plaintiff therefore lacked standing to sue the Durham Center for discrimina-

tory failure to promote and for failure to follow policy and procedure.[7] *See* Final Decision, Petition for Contested Hearing, 02OSP1001, Conclusions of Law, ¶ 8. Plaintiff did not seek review of the ALJ's Final Decision.

In Plaintiff's second petition for a contested case hearing, filed on July 1, 2002, Plaintiff made the same allegations as in her first petition, except that she claimed discriminatory failure to promote her to serve as the permanent Area Director position (as opposed to failure to promote her to the *Interim* Area Director position) and she did not allege age discrimination. *See* 02OSP1116. In a Final Decision issued January 16, 2003, an ALJ held that the Durham Center had not yet selected a permanent Area Director. The ALJ noted that, under an employment agreement with the Durham Center, Holliman was serving as the Interim Area Director while the Durham Center sought a permanent Area Director, and that Holliman's appointment was slated to end on March 31, 2003. Thus, Plaintiff's claim based on the Durham Center's failure to promote her to the position of permanent Area Director was not ripe for review. The ALJ dismissed the petition with prejudice, and Plaintiff did not appeal. Finally, in Plaintiff's third petition for a contested case hearing, filed on October 22, 2002, Plaintiff alleged retaliatory suspension and firing based on her complaints about race and color discrimination, but she voluntarily dismissed that petition on April 23, 2003. *See* Petition for Contested Case Hearing 02OSP1736.

**DISCUSSION**

██ The burden of proving subject matter jurisdiction on a motion to dismiss is on the plaintiff. *Adams v. Bain*, 697

---

7. On February 27, 2003, the ALJ began conducting a hearing on Plaintiff's claims. Before the presentation of her evidence, Plaintiff withdrew her age discrimination claim.

F.2d 1213, 1219 (4th Cir.1982). In determining whether jurisdiction exists, the district court must regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *Richmond, Fredericksburg & Potomac R.R. v. United States,* 945 F.2d 765, 768 (4th Cir.1991). The district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. *Id.* A court should grant the Rule 12(b)(1) motion to dismiss if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.

*Whether Plaintiff's Claims Are Barred by the Rooker–Feldman Doctrine*

█ I first consider Defendants' contention that Plaintiff's claims are barred by the *Rooker–Feldman* doctrine because this court's adjudication of Plaintiff's claims would constitute an impermissible review of Plaintiff's state court negligence and open meetings lawsuits.[8] The *Rooker–Feldman* doctrine generally prohibits lower federal courts from reviewing state court decisions; "rather, jurisdiction to review such decisions lies exclusively with superior state courts and, ultimately, the United States Supreme Court." *Plyler v. Moore,* 129 F.3d 728, 731 (4th Cir.1997). The *Rooker–Feldman* bar extends not only to issues actually presented to and decided by a state court, but also to issues that are "inextricably intertwined" with questions ruled on by a state court. *Id.* A federal claim is "inextricably intertwined" with a state court decision where, "in order to grant the federal plaintiff the relief sought,

the federal court must determine that the [state] court judgment was erroneously entered or must take action that would render the judgment ineffectual." *Jordahl v. Democratic Party of Va.,* 122 F.3d 192, 202 (4th Cir.1997). *Rooker–Feldman,* therefore, applies when the federal action "essentially amounts to nothing more than an attempt to seek review of [the state court's] decision by a lower federal court." *Plyler,* 129 F.3d at 733; *see also Brown & Root, Inc. v. Breckenridge,* 211 F.3d 194, 201 (4th Cir.2000).

█ I first find that Plaintiff's claims in this lawsuit do not require the court to review any issues "actually decided" by the North Carolina courts. In Plaintiff's two previously filed state court lawsuits, the state courts addressed only whether Defendants negligently failed to comply with local and state hiring procedures and violated North Carolina's Open Meetings Law when filling the Area Director position. In this lawsuit, by contrast, the court is confronted with whether, when denying Plaintiff a promotion to the Interim Area Director position and when suspending and then firing Plaintiff, Defendants discriminated and retaliated against Plaintiff because of her race, color, and age in violation of Title VII, 42 U.S.C. § 1981, and the ADEA; whether Defendants are liable for "whistleblower retaliation" under North Carolina law; and whether Defendants violated Plaintiff's First Amendment rights by firing her after she complained about the improper process utilized and the wasteful expenditures of public funding in the hiring of Defendant Holliman to the Interim Area Director position. *See* Plaintiff's Amended Compl. In reviewing Plaintiff's claims in this lawsuit, the court will not review any issues "actually decid-

---

**8.** The *Rooker–Feldman* doctrine is derived from the United States Supreme Court's decisions in *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), and *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

ed" by the North Carolina courts in Plaintiff's previously filed state court lawsuits.

Furthermore, the issues in this lawsuit are not "inextricably intertwined" with the issues decided in the state court lawsuits. That is, a ruling in favor of Plaintiff's claims here would not imply that the state courts wrongly decided the issues raised in either the negligence or the open meetings lawsuit. First, in this case the issue of whether Defendants discriminated against Plaintiff based on her race, color, and age in violation of Title VII, 42 U.S.C. § 1981, and the ADEA has no bearing on whether Defendants' alleged failure to follow personnel procedures constituted negligence under North Carolina law or whether Defendants violated North Carolina's Open Meetings Law when selecting an Interim Area Director.

■ As to the applicability of *Rooker–Feldman* to Plaintiff's First Amendment and state whistleblower claims, in support of these claims Plaintiff alleges that she was fired for complaining about the center's violations of personnel policies and North Carolina's Open Meetings Law. In the negligence and open meetings lawsuits, the state courts concluded that the defendants did not violate North Carolina's Open Meetings Law and that defendants did not violate personnel policies and procedures in selecting Holliman for the Interim Area Director position. A finding in favor of Plaintiff on the First Amendment and whistleblower claims here would not imply that the state court holdings were wrong in this regard. This is so because to prove either the First Amendment or the state whistleblower claim here, Plaintiff need not prove the truth of the matters she allegedly spoke out about. To establish a First Amendment claim, a public employee must demonstrate that (1) the employee speaks as a citizen about matters of public concern, (2) the employee's interest in exercising free speech is not outweighed by the countervailing interest of the state in providing the public service the employee was hired to provide, and (3) the protected speech played a substantial role or was a motivating factor in the termination decision. *Stroman v. Colleton County Sch. Dist.*, 981 F.2d 152, 156 (4th Cir.1992). In First Amendment claims, the truth or falsity of the employee's assertion is irrelevant, *Buschi v. Kirven*, 775 F.2d 1240, 1248 (4th Cir.1985), and the employee's exercise of her right to speak out is protected "absent proof of false statements knowingly or recklessly made," *Pickering v. Board of Educ.*, 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). A public employee need not "offer any evidence of the truth of [her] criticisms and, likewise the defendants [have] no right to seek to prove the falsity of the criticisms. The question [i]s simply one of law whether the statements, irrespective of their truth or falsity, raised a 'matter of public concern.'" *Buschi*, 775 F.2d at 1248. Similarly, North Carolina's Whistleblower Act, which generally protects state employees from retaliation for reporting governmental misconduct, does not require a plaintiff to prove the truth of the governmental misconduct that she has spoken out about. Instead, as a defense to a whistleblower claim, the defendant must prove that the employee knows or has reason to believe that the report of governmental misconduct is inaccurate.[9] *See generally*

---

9. North Carolina's Whistleblower Act provides, in pertinent part:

No head of any State department, agency or institution or other State employee exercising supervisory authority shall discharge, threaten or otherwise discriminate against a State employee regarding the State employee's compensation, terms, conditions, location, or privileges of employment because the State employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, any activity described in [§ 126–84], *unless the*

*Aune v. University of North Carolina at Chapel Hill,* 120 N.C.App. 430, 462 S.E.2d 678 (1995). Thus, although Plaintiff's state court claims and her First Amendment and whistleblower claims here share overlapping issues, a ruling in favor of Plaintiff on her First Amendment and whistleblower claims here would not necessarily imply that the state courts wrongly decided the issues raised in either the negligence or the open meetings lawsuit. In sum, the *Rooker–Feldman* doctrine does not bar the court from reviewing Plaintiff's claims.[10] *See, e.g., Safety–Kleen, Inc. v. Wyche,* 274 F.3d 846, 858 (4th Cir.2001) (also finding no *Rooker–Feldman* bar).

*Whether Plaintiff's Claims Are Barred by Res Judicata Principles*

■ Defendants next contend that even if Plaintiff's claims are not barred by *Rooker–Feldman,* they are nevertheless barred by the doctrine of res judicata, or claim preclusion, because Plaintiff could have brought her claims in the state court open meetings and negligence lawsuits. The United States Constitution's Full Faith and Credit Clause, which is implemented by the Federal Full Faith and Credit Statute, 28 U.S.C. § 1738, requires federal courts to give state court judg-

ments the same preclusive effect that they would enjoy in the courts of the rendering state.[11] *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). The issue for this court is whether, if this action were pending in a North Carolina state court, the North Carolina court would give the earlier state court judgments in the open meetings and negligence lawsuits claim-preclusive effect and bar Plaintiff from proceeding with this lawsuit.

North Carolina courts have held that the doctrine of res judicata, or claim preclusion, bars a subsequent suit when there has been (1) a final judgment on the merits in an earlier suit, (2) an identity of the cause of action in both the earlier and the later suit, and (3) an identity of parties or their privies in the two suits.[12] *Ballance v. Dunn,* 96 N.C.App. 286, 290, 385 S.E.2d 522, 524–25 (1989); *Hogan v. Cone Mills Corp.,* 315 N.C. 127, 135, 337 S.E.2d 477, 482 (1985); *Kirkcaldy v. Richmond County Bd. of Educ.,* 212 F.R.D. 289, 293 (M.D.N.C.2002). Here, the parties do not dispute that Plaintiff received a final judg-

---

*State employee knows or has reason to believe that the report is inaccurate.*

N.C. GEN. STAT. § 126–85(a) (1995) (emphasis added).

**10.** I note that the *Rooker–Feldman* doctrine does not apply to Plaintiff's three administrative filings. *Verizon Md. Inc. v. Public Service Comm'n,* 535 U.S. 635, 644 n. 3, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) ("The doctrine has no application to judicial review of executive action, including determinations made by a state administrative agency.").

**11.** The Full Faith and Credit Clause provides:

Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And

the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

U.S. CONST. art. IV, § 1. Title 28 U.S.C. § 1738 provides in pertinent part:

Such ... records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

**12.** North Carolina courts also adhere to the companion doctrine of collateral estoppel, or issue preclusion. *See Clancy v. Onslow County,* 151 N.C.App. 269, 271, 564 S.E.2d 920, 922–23 (2002).

ment on the merits in the state court lawsuits and that the lawsuits involved the same parties as in this lawsuit. The only disputed issue is whether there is "an identity of the cause of action in both the earlier and the later suit." Under the modern trend, many state and federal courts, including the Fourth Circuit, apply a broad "transactional" test regarding the "identity of claims" issue, which asks whether "the new claim arises out of the same transaction or series of transactions as the claim resolved by the prior judgment." *See Keith v. Aldridge,* 900 F.2d 736, 740 (4th Cir.1990). Under this broad test, claim preclusion prevents the "litigation by the plaintiff in a subsequent action of claims 'with respect to all or any part of the transaction, or series of connected transactions, out of which the [first] action arose.'" *Harnett v. Billman,* 800 F.2d 1308, 1314 (4th Cir.1986) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 24(1) (1982)). Thus, mere differences in legal theories of a claim or defense, or in remedies sought, or in evidence produced do not create "different" claims, and res judicata will bar a subsequent lawsuit if its claims arise out of the same core of operative facts that led to the initial lawsuit. *See In re Varat Enters., Inc.,* 81 F.3d 1310, 1316 (4th Cir.1996).

North Carolina courts have employed a "cautious and flexible adoption" of the "transactional" test and construe the res judicata bar more narrowly than most federal and state courts. *See Davenport v. North Carolina Dep't of Transp.,* 3 F.3d 89, 95 (4th Cir.1993) (discussing North Carolina's tendency to apply res judicata more restrictively than federal courts); *Lawson v. Toney,* 169 F.Supp.2d 456, 463 (M.D.N.C.2001) (stating that North Carolina courts have not conclusively adopted the transactional test). In other words, North Carolina courts have allowed lawsuits to go forward where other courts would have found them to be clearly

barred by res judicata. For instance, in *Bockweg v. Anderson* a woman and her husband filed a medical malpractice lawsuit in federal court, alleging that during the delivery of the couple's baby by cesarean section the operating doctors lacerated the wife's uterus, resulting in a pelvic infection and requiring the wife to undergo a hysterectomy. 333 N.C. 486, 490, 428 S.E.2d 157, 160 (1993). The plaintiffs alleged that the defendants had negligently caused the unnecessary loss of the wife's reproductive organs and that during the wife's resulting hospital stay the defendants negligently failed to monitor her nutrition, causing her to suffer brain damage. *Id.* at 488, 428 S.E.2d at 159. The plaintiffs subsequently voluntarily dismissed the reproductive organs claim without prejudice, the plaintiffs settled with some of the defendants as to the brain damage claim, and the case went to trial on the brain damage claim as to the remaining defendants. *Id.* A jury found no liability as to the remaining defendants on the brain damage claim. *Id.* at 489, 428 S.E.2d at 159.

The plaintiffs subsequently filed a lawsuit against the same defendants in state court, alleging negligence resulting in an unnecessary loss of the wife's reproductive organs. *Id.* The defendants moved for dismissal, contending that the state court suit was barred by res judicata principles. The North Carolina Supreme Court ultimately held that the plaintiffs were not barred by res judicata from bringing the second lawsuit, even though both acts of negligence occurred during the wife's hospital stay after her cesarean section. In finding that the second negligence lawsuit was not barred by res judicata, the *Bockweg* Court concluded that the "Plaintiffs did not merely change their legal theory or seek a different remedy"; rather, the plaintiffs were "seeking a remedy for a separate and distinct negligent act leading to a separate and distinct injury." *Id.* at

494, 428 S.E.2d at 163; *see also Beck v. City of Durham*, 154 N.C.App. 221, 233, 573 S.E.2d 183, 192 (2002) (where the plaintiff's § 1983 claims were not barred by res judicata because the claims were based on different factual allegations from those alleged in an earlier § 1983 lawsuit).

■ Considering the fairly narrow application of res judicata by North Carolina courts, I find that a North Carolina court would most likely hold that this lawsuit is not barred by res judicata even though this lawsuit and Plaintiff's state court lawsuits arose in part from the circumstance of Plaintiff's failure to be promoted to the position of Area Director. Plaintiff's state court lawsuits arose wholly out of her failure to be promoted and had nothing to do with the retaliatory and discriminatory suspension and firing claims alleged here.[13] Furthermore, the nature of the evidence required in this case-which will include proving that Defendants discriminated against Plaintiff based on Plaintiff's race, color, and age, and that Defendants fired Plaintiff in violation of her First Amendment rights and her rights under North Carolina's whistleblower law-is entirely different from the nature of the evidence required in the state court lawsuits-which included proof that Defendants failed to follow personnel hiring procedures when filling the Area Director position and that

Defendants held closed sessions in violation of North Carolina's Open Meetings Law. In sum, this lawsuit is not barred by res judicata despite that Plaintiff's claims in this lawsuit and her claims in the state court lawsuits arose, at least in part, out of the circumstance of her failure to be promoted. *See, e.g., Herrmann v. Cencom Cable Assocs.*, 999 F.2d 223, 226 (7th Cir. 1993) (where the plaintiff filed an ERISA action and then filed a separate lawsuit under Title VII, the plaintiff's Title VII claim was not barred by res judicata even though both lawsuits arose out of the circumstance of the plaintiff losing her job). I therefore recommend that the court deny Defendants' motion to dismiss based on the *Rooker–Feldman* doctrine and res judicata principles.

*Whether the Durham Center is an Arm of the State for Purposes of Eleventh Amendment Immunity*

■ I next address the claim by Defendant Durham Center that it is an arm of the State of North Carolina and therefore enjoys Eleventh Amendment immunity from Plaintiff's claims.[14] The Eleventh Amendment prevents a federal court from entertaining a suit brought by a citizen against a State or against an instrumentality of the State that is considered an "arm of the State."[15] *Regents of Univ. of Calif.*

---

13. Indeed, the state court lawsuits were filed months before Plaintiff was suspended and then fired.

14. The Eleventh Amendment analysis as to the Durham Center necessarily also applies to the Defendant Area Board members as they are being sued in their official capacities. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that Eleventh Amendment immunity necessarily applies to state employees acting in their official capacities because a suit against a state official in his official capacity is in effect a suit against the state entity); *Revene v. Charles County Comm'rs*, 882 F.2d 870, 874 (4th Cir.1989) (same).

15. The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms the Amendment applies only to suits brought against a State by "Citizens of another State," it is well established that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993).

*v. Doe*, 519 U.S. 425, 430, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). Eleventh Amendment protection does not, however, extend to mere political subdivisions of a State such as counties or municipalities, even if the counties and municipalities exercise a "slice of State power." *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Furthermore, state sovereign immunity under the Eleventh Amendment is not absolute, and no sovereign immunity defense is available where one of three exceptions applies: (1) where Congress, while acting pursuant to its powers under the Fourteenth Amendment, has properly abrogated a state's immunity, *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 59, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); (2) where a state has waived its immunity by consenting to suit in federal court, *see College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); or (3) where a private party sues an appropriate state officer for prospective injunctive or declaratory relief from an ongoing violation of federal law, *see Ex parte Young*, 209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

Since the Eleventh Amendment applies only to states and their instrumentalities, the crucial question in many Eleventh Amendment cases is whether an agency or official is properly characterized as an arm of a State or as an arm of local government. Indeed, the issue before this court turns on whether the Durham Center, a state mental health area authority operating under N.C. GEN. STAT. § 122C, "is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." *Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. 568.

■ There is no clear line separating state instrumentalities that are entitled to Eleventh Amendment sovereign immunity from those that are not, and courts must follow the Supreme Court's admonition that courts should seek guidance in the twin purposes of the Eleventh Amendment, namely: (1) "the States' fears that federal courts would force them to pay their Revolutionary War debts, leading to their financial ruin," and (2) "the integrity retained by each State in our federal system." *Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 39, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). Thus, the primary factor to be considered in an Eleventh Amendment analysis is whether a damage award against the governmental entity would be paid from the State's treasury.[16] *Harter v. Vernon*, 101 F.3d 334, 337 (4th Cir.1996). Generally, if the damage award would be paid from the State treasury, the inquiry is at an end, and the court must conclude that the entity is an arm of the

**16.** I note that after the United States Supreme Court's decisions in *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997), and *McMillian v. Monroe County*, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997), several district courts in this circuit suggested that the impact of a judgment on a State's treasury is no longer the dominant factor in determining Eleventh Amendment immunity. *See, e.g., Conlin v. Southwestern Cmty. College*, No. 2:99CV247–C, 2001 WL 1019918, at *1 (W.D.N.C. Jan. 24, 2001); *Sampson v. Maynor*, No. 7:99–CV–51–F (E.D.N.C. Oct. 6, 1999). In *Cash v. Granville County Board of Education*, however, this circuit's court of appeals expressly rejected the district courts' interpretation of *Regents* and *McMillian* and held that the impact of a judgment on a State treasury is still the dominant factor in determining Eleventh Amendment immunity. 242 F.3d 219, 223–24 (4th Cir. 2001).

State for purposes of Eleventh Amendment immunity. *Hess,* 513 U.S. at 50, 115 S.Ct. 394; *Cash,* 242 F.3d at 223. In determining whether a damage award would come from a State's funds, courts analyze whether the general funds appropriated to the entity come primarily from the State or whether the entity raises its own monies. If the entity obtains a significant amount of local appropriations, a judgment against it may not affect a State's coffers. *Keller v. Prince George's County,* 827 F.2d 952, 964 (4th Cir.1987).

■ Even if the State's treasury will not be used to satisfy a judgment a court must still determine whether the relationship between the entity and the State is close enough to implicate the "dignity of the State as a sovereign." *Cash,* 242 F.3d at 224. Courts apply three factors in making this determination: (1) the degree of control that the State exercises over the entity; (2) whether the entity deals with local rather than statewide concerns; and (3) the manner in which state law treats the entity.[17] *Id.*

■ I begin the Eleventh Amendment analysis by examining the statutes governing North Carolina mental health area authorities such as the Durham Center. North Carolina's Mental Health, Developmental Disabilities, and Substance Abuse Act of 1985 ("the Act") provides that mental health, developmental disabilities, and substance abuse services shall be provided to North Carolina citizens through the collaborative efforts of three separate types of public entities, which the Act refers to as "area authorities," "county programs," and "State facilities." N.C. GEN. STAT. §§ 122C–2 to 122C–433; N.C. GEN. STAT. § 122C–101. The Act's Policy Statement provides generally that within available resources State and local governments must provide community based "mental health, developmental disabilities, and substance abuse services." To this effect, state and local governments must develop and maintain a unified system of services centered in area authorities or county programs and furthermore must ensure that certain enumerated core services are available. *See* N.C. GEN. STAT. § 122C–2. Thus, under the Act, each North Carolina county must participate in either an area authority or a county program.[18] The Act further pro-

**17.** In their original briefs to this court, neither party supplied the court with adequate information to resolve the Eleventh Amendment immunity issue. For instance, to support its Eleventh Amendment argument in its original brief, Defendant Durham Center pointed only to the fact that the center is defined as a "local political subdivision" of North Carolina under the relevant statutes. *See* N.C. GEN. STAT. § 122C–116. I noted in an earlier order that the statutory categorization of the Durham Center as a "local political subdivision" of North Carolina does not resolve the issue of whether the center is an arm of the State of North Carolina for purposes of Eleventh Amendment immunity. Indeed, courts sometimes employ the phrase "local political subdivision" when distinguishing entities that are *not* arms of the State from entities that do qualify as arms of the State for Eleventh Amendment purposes. *See, e.g., Kitchen v. Upshaw,* 286 F.3d 179, 185 (4th Cir.2002) ("[T]he governing body of

the Authority is appointed by the governing bodies of the participating local political subdivisions, *not* the Commonwealth.") (emphasis added). I ordered further briefing from the parties, and they have now submitted additional briefs addressing the relevant factors in the Eleventh Amendment analysis.

**18.** County programs and area authorities operate pursuant to separate statutory provisions under the Act. *See* N.C. GEN. STAT. § 122C–115.1 (county programs); N.C. GEN. STAT. § 122C–117 (area authorities). County programs are defined as "mental health, developmental disabilities, and substance abuse services program[s] established, operated, and governed by a county," *see* N.C. GEN. STAT. § 122C–3(10a), and area authorities are defined as "local political subdivisions of the State except that a single county area authority is considered a department of the county in which it is located for the purposes of [local government finance under Chapter 159 of

vides that, within available resources, the State must provide funding to area authorities.[19] *See* N.C. GEN. STAT. § 122C–2. State appropriations to area authorities generally must be used only for the operating costs of the area authority, except that the Secretary of the North Carolina Department of Health and Human Services may specify that designated State funds may be used by the area authorities to purchase real estate. *See* N.C. GEN. STAT. § 122C–147(b). As to potential legal judgments, the Act provides that "[t]he board or boards of county commissioners that establish the area authority and the Secretary [of the North Carolina Department of Health and Human Services] may allocate funds not otherwise restricted by law, in addition to the funds allocated for the operation of the program, for the purpose of paying legal defense, judgments, and settlements ...." N.C. GEN. STAT. § 122C–153(d).

Here, the Durham Center is a single county area authority with Durham County as its only participating county. The Durham Center receives funding through fees charged to members of the public as recipients of services, through state and county budget allotments, and through other financing sources, including private and foundation fund donations from a non-profit corporation set up for that purpose. Plaintiff contends that State coffers would most likely not be affected by a legal judgment against the Durham Center for several reasons. Plaintiff first asserts that the funds generated by the center and Durham County make up a significantly larger portion of the center's yearly budget than funds received from the State. Plaintiff has submitted evidence that the center's budget for the 2003–2004 fiscal year is $36,396,829. Of that amount, $6,958,572 (or 19%) comes from Durham County, $9,581,629 (or 26%) comes from State funds, and $19,856,628 (or 54%) comes from the center through fees charged by the center and a non-profit that contracts with the center for services. *See* Davis Aff. at ¶ 5 and Exs. 1 and 2. Plaintiff further states that the center maintains a reserve fund of $5 million that could be used to pay any legal judgment against the center. Davis Aff., Ex. 1. Plaintiff also notes that the center participates in Durham County's Risk Management Program and contributes money to the program for the purpose of paying legal defenses, judgments, and settlements. Plaintiff contends that the Durham Center's participation in the county program "demonstrates that the payments of judgments would not rise to the level of the State and is planned in a way that the Center is covered through the County Risk Management Program." Pl.'s Supplemental Br. at 7. Finally, Plaintiff contends that in past litigation with employees, funds have been paid out of the center's general budget and no State monies were requested for the payments. Davis Aff. ¶¶ 10–11.

█ I find that Plaintiff has submitted sufficient evidence to the court to show that a damage award against the Durham Center would most likely not be paid out of State coffers. In opposing Plaintiff's arguments, Defendants counter only that since the money appropriated to the Durham Center for its operational costs comes

the General Statutes]," *see* N.C. GEN. STAT. § 122C–116(a).

**19.** Furthermore, under the Act counties *must* and cities *may* appropriate funds to support the programs of the area authorities that serve the counties and cities, and counties may not reduce county appropriations and expenditures for operations and ongoing programs and services of area authorities because of the unavailability of State-allocated funds, fees, capitation amounts, or fund balance to the area authority or county program. *See* N.C. GEN. STAT. § 122C–115(d).

in part from State funds, then any legal judgment would necessarily be paid from the State's treasury. The mere fact that a local governmental unit may receive *some* funds from general State revenues, however, "does not transform [that] unit into an 'arm of the state'" for Eleventh Amendment purposes. *American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County*, 997 F.Supp. 1476, 1480 (M.D.Fla.1998). For the reasons offered by Plaintiff, I conclude that a judgment against the Durham Center in this case would most likely not be paid out of State coffers.

I must still determine, however, whether the relationship between the Durham Center and the State of North Carolina is close enough to implicate the "dignity of the State as a sovereign." *Cash*, 242 F.3d at 224. Thus, I must consider (1) whether the Durham Center deals with local rather than statewide concerns; (2) the degree of control that the State exercises over the Durham Center; and (3) the manner in which state law treats the Durham Center. *Id.* First, as to whether mental health area authorities such as the Durham Center deal with statewide, rather than local, concerns, the statutory scheme makes clear that area authorities were created for providing localized implementation of statewide policies and concerns. As to whether area authorities are subject primarily to local or state control, under the statutory scheme the participating county governments conduct daily governance of the area authorities. For instance, each area authority's Area Board is chosen by county commissioners, and the Area Board appoints an Area Director, who serves as the administrative head of the area program.[20] *See* N.C. Gen. Stat. §§ 122C–117(7), 122C–118.1(a), 122C–121(a). The Area Director's appointment is subject to the approval of the board of county commissioners, unless one or more boards of commissioners waives approval authority. *See* N.C. Gen. Stat. § 122C–117(7). The appointment of the Area Director is conducted entirely on a local level by a search committee, which includes consumer board members, a county manager, and one or more county commissioners, except that the Secretary of the North Carolina Department of Health and Human Services may appoint one member to the search committee. *See* N.C. Gen. Stat. § 122C–117(7). I further note that the employees of the Durham Center are subject to daily local governance by Durham County.[21] For instance, Durham County maintains daily control over personnel matters, such as maintaining personnel records, issuing county identifications and paychecks, and administering health and medical benefits. Furthermore, the county conducts employee hiring and performance appraisals, determines salary increases, and issues a county employment handbook to all center employees. Davis Aff. ¶¶ 15, 16.

20. In single county area authorities, the board of county commissioners appoints the members of the Area Board. *See* N.C. Gen. Stat. § 122C–118.1(a). In multiple county area authorities, each board of county commissioners within the area must appoint one commissioner as a member of the area board, and those members must appoint the remaining members.

21. For the purpose of personnel administration, Durham Center employees are governed by the state personnel system, set out in N.C. Gen. Stat. § 126–1 et seq., unless otherwise provided, *see* N.C. Gen. Stat. § 122C–154; *see also* N.C. Gen. Stat. 126–5 (employees of mental health area authorities are subject to Chapter 126). The state personnel system is a mode of personnel administration applicable to State government and to "local employees paid entirely or in part from federal funds ...." N.C. Gen. Stat. § 126–1.

Area authorities also exhibit autonomy from the State in that they can sue and be sued in their own capacities; indeed, in this case the Durham Center is being represented by Durham County attorneys rather than by the North Carolina Attorney General's Office. *See, e.g., Ram Ditta v. Maryland Nat'l Capital Park & Planning Comm'n,* 822 F.2d 456, 458–59 (4th Cir.1987). Area authorities also function somewhat independently of the State with regard to financing and title of area authority property. For instance, all real property purchased for use by the area authority must be provided by local or federal funds, except that area authorities may use those State funds specifically designated for the purchase of real estate or specific capital funds appropriated by the North Carolina General Assembly. *See* N.C. GEN. STAT. § 122C–147(c). Title to the real property and the authority to acquire it is held by the county where the property is located, except that title to real property and the authority to acquire it may be held by the area authority with the approval of the board or boards of commissioners of all counties served by the area authority. *See* N.C. GEN. STAT. § 122C–147(c).

Furthermore, the counties participating in an area authority have some control over whether the area authority will continue to operate. For instance, when a board of commissioners of each county constituting an area authority determines that an area authority is not operating in the best interest of its consumers, the board may order dissolution of the area authority. N.C. GEN. STAT. § 122C–115.3(a). Similarly, a board of commissioners in a county served by the area authority may withdraw from the area authority if the board determines that the area authority is not operating in the best interest of its consumers in that county. In both instances, however, before dissolution or withdrawal, the board must receive prior approval by the Secretary, and the board must demonstrate that continuity of services will be assured. N.C. GEN. STAT. § 122C–115.3(a).

Despite the area authorities' autonomy in certain areas, the State nevertheless exerts significant control over them. For instance, in order to operate, an area authority must submit a business plan to the State, and the State must approve and certify that the plan is in accordance with the State Plan for Mental Health, Developmental Disabilities, and Substance Abuse Services ("the State Plan"). N.C. GEN. STAT. § 122C–112.1; *see also* N.C. GEN. STAT. § 122C–115 (stating that "a board of county commissioners or two or more boards of county commissioners jointly shall establish an area authority with the approval of the Secretary"). The Secretary of the North Carolina Department of Health and Human Services oversees and enforces the area authorities' implementation of the State Plan and is responsible for establishing a process and criteria for the submission, review, and approval or disapproval of each area authorities' business plan. The Secretary also oversees and monitors the area authorities' compliance with state and federal policy, law, and standards and monitors the fiscal and administrative practices of area authorities for management and use of federal and state funds. N.C. GEN. STAT. § 122C–112.1. Furthermore, the Area Director for each area authority is charged with enforcing "applicable State laws, rules of the Commission [for Mental Health, Developmental Disabilities, and Substance Abuse Services], and rules of the Secretary." *See* N.C. GEN. STAT. § 122C–111. Finally, the State may withhold appropriations or even order dissolution of the area authority if the Secretary concludes that the area authority is not providing minimally adequate services or otherwise not operating in accordance with State requirements.

*See* N.C. GEN. STAT. § 122C–124.1; § 122C–147. Thus, although daily operations for each area authority are run on a local level, with input from the officials of the counties served by the area authority, the State nevertheless exerts significant control over each area authority.

Finally, as to the manner in which the State treats mental health area authorities such as the Durham Center, I find that state law treats these entities as clearly distinct from the State and its agencies. First, under the relevant statutory provisions, area authorities are treated as local governmental units that are separate from the county programs and State facilities also participating in North Carolina's public mental health system. For instance, the Act specifically lists each State facility and provides that the Secretary of the North Carolina Department of Health and Human Services is responsible for operating those facilities. *See* N.C. GEN. STAT. § 122C–181. The Act further provides that an area facility is "a facility that is operated by or under contract with the area authority," whereas a State facility is "a facility that is operated by the Secretary," and "[a] State facility is not an area facility." N.C. GEN. STAT. § 122C–3(14)(a), (f). I further note that the State has authorized itself to assess financial penalties against area authorities for failure to meet State requirements. *See* Davis Aff., Ex. 3, 2003–2004 Performance Agreement, at 6, Ex. 5. As Plaintiff points out, it would be nonsensical for the State to assess a financial penalty against itself; therefore, by its own conduct, the State treats mental health area authorities as entities that are separate and distinct from the State and its agencies.

North Carolina caselaw also treats area authorities as local, regional entities that are distinct from the State and its agencies. *See, e.g., Cross v. Residential Support Servs., Inc.,* 123 N.C.App. 616, 619, 473 S.E.2d 676, 678 (1996); *Clancy,* 151 N.C.App. at 274, 564 S.E.2d at 924; *U.S. ex rel. Lindsey v. Trend Cmty. Mental Health Services,* 88 F.Supp.2d 475, 478 (W.D.N.C.1999). Although North Carolina courts sometimes describe area authorities as "state agencies" in judicial opinions, the courts tend to treat area authorities as regional entities that are more like counties or municipalities than state agencies. *See, e.g., Jackson for Jackson v. North Carolina Dept. of Human Res. Div. of Mental Health, Developmental Disabilities & Substance Abuse Services,* 131 N.C.App. 179, 505 S.E.2d 899 (1998) (describing the mental health area authority for Orange, Person, and Chatham counties as a "state agency").

Considering all the factors noted above, I find that a judgment against the Durham Center would not affect "the dignity of the State" and that Defendant Durham Center is more like a local political subdivision than an arm of the State of North Carolina for Eleventh Amendment purposes. Thus, the court should find that Plaintiff is not barred by the Eleventh Amendment from bringing her claims against the Durham Center.[22]

### Motion to Dismiss

In ruling on a motion to dismiss for failure to state a claim, it must be recalled that the purpose of a 12(b)(6) motion is to test the sufficiency of the complaint, not to decide the merits of the action. *Schatz v. Rosenberg,* 943 F.2d 485, 489 (4th Cir.

---

**22.** In addition to arguing that Defendant Durham Center may not claim Eleventh Amendment sovereign immunity, Plaintiff has also alleged a general waiver of state sovereign immunity, which is sufficient to survive a motion to dismiss and, in any event, Defendant Durham Center cannot benefit from state sovereign immunity as to any of Plaintiff's remaining claims.

1991); *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 887 F.Supp. 811, 813 (M.D.N.C.1995). At this stage of the litigation, a plaintiff's well-pleaded allegations are taken as true and the complaint, including all reasonable inferences therefrom, are liberally construed in the plaintiff's favor. *McNair v. Lend Lease Trucks, Inc.*, 95 F.3d 325, 327 (4th Cir. 1996).

Dismissal under 12(b)(6) is generally regarded as appropriate only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *McNair*, 95 F.3d at 328 (noting that the proper question is whether in the light most favorable to the plaintiff, the complaint states any valid claim for relief); *Food Lion*, 887 F.Supp. at 813. Stated differently, the issue is not whether the plaintiff will ultimately prevail on his claim, but whether he is entitled to offer evidence to support the claim. *See, e.g., Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

Generally, the court looks only to the complaint itself to ascertain the propriety of a motion to dismiss. *See George v. Kay*, 632 F.2d 1103, 1106 (4th Cir.1980). A plaintiff need not plead detailed evidentiary facts, and a complaint is sufficient if it will give a defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *See Bolding v. Holshouser*, 575 F.2d 461, 464 (4th Cir.1978). Nonetheless, the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege any facts which set forth a claim.

*Motions to Dismiss By Defendants Durham County, the Durham Center Area Board, and the Individual Defendants Sued in Their Official Capacities*

■ I first find that all claims should be dismissed as to some of the defendants in this case for the following reasons. First, Plaintiff has sued Defendant Jackye Knight in her official capacity as an agent of Durham County; Ellen Holliman in her official capacity as the Durham Center's Area Director; MaryAnn E. Black in her official capacity as a Durham County Commissioner and Area Board member; and Harold Batiste, Nancye Bryan, Karen Crumbliss, Phillip Golden, Terrance McCabe, Thomas Owen, Douglas Wright, and Hugh Wright, Jr., in their official capacities as Area Board members. Suing a governmental employee in his "official" capacity is simply another way of pleading an action against the governmental entity. *See Mandsager v. University of North Carolina at Greensboro*, 269 F.Supp.2d 662, 672 n. 2 (M.D.N.C.2003); *Love–Lane v. Martin*, 201 F.Supp.2d 566, 574 (M.D.N.C.2002); *Wright v. Blue Ridge Area Auth.*, 134 N.C.App. 668, 670, 518 S.E.2d 772, 774 (1999). Thus, the suit against Jackye Knight in her official capacity as an agent of Durham County is effectively a claim against Durham County; the suit against Ellen Holliman in her official capacity as the Durham Center's Area Director is effectively a claim against the Durham Center; the suit against MaryAnn E. Black in her official capacity as a Durham County Commissioner is effectively a claim against Durham County; and the suit against the individual Area Board members in their official capacities is effectively a suit against the Durham Center.

■ Next, I find that Durham County should be dismissed as a defendant because the county was not Plaintiff's

employer, and it therefore cannot be liable for Plaintiff's employment discrimination and other claims. Before July 1, 2002, § 122C–154 of the North Carolina General Statutes provided that employees "under the direct supervision of the area authority" were employees of the area authority. Effective July 1, 2002, § 122C–154 now states that employees under the direct supervision of the area director are employees of the area authority and that employees appointed by the county program director are employees of the county. Here, Plaintiff has not alleged that she was appointed by the county program director, and by Plaintiff's own allegations she worked under the direct supervision of the Durham Center's Area Director. Therefore, under either version of § 122C–154, Plaintiff was an employee of Defendant Durham Center and not an employee of Durham County, and Durham County should therefore be dismissed as a defendant. *See Klassette v. Mecklenburg County Area Mental Health,* 88 N.C.App. 495, 364 S.E.2d 179 (1988) (assuming *sub silentio* that the plaintiff employees were employees of the area authority rather than employees of the counties served by the area authority); *Area Mental Health Auth. v. Speed,* 69 N.C.App. 247, 317 S.E.2d 22 (1984) (same).

■■■ Finally, to the extent that Plaintiff has named the Durham Center's Area Board as a defendant, that claim should be dismissed because the Area Board, as the governing unit of the Durham Center, has no legal existence independent from the Durham Center. *See* N.C. GEN. STAT. § 122c–117(b); *Piland v. Hertford County Bd. of Comm'rs,* 141 N.C.App. 293, 298, 539 S.E.2d 669, 672 (N.C.App.2000); *Avery v. County of Burke,* 660 F.2d 111, 113–14 (4th Cir.1981). Therefore, it is recommended that the Durham Center's Area Board be dismissed as a Defendant. Thus, I find that the only true defendant in this case is the Durham Center, and I will address the merits of the motion to dismiss Plaintiff's claims with only Defendant Durham Center in mind.

## Issue–Preclusive Effect of Unreviewed Administrative Findings

Before turning to the merits of Plaintiff's claims against the Durham Center on the motion to dismiss, I first address whether the court must give issue-preclusive effect to certain factual findings made by a state ALJ with regard to Plaintiff's non-promotion claim.[23] As mentioned previously, on June 12, 2002, Plaintiff a petition for a contested case hearing with the North Carolina Office of Administrative Hearings arising out of her alleged failure to be promoted to the Interim Area Director position at the Durham Center. In a Final Decision issued August 6, 2003, a state ALJ found as fact that Plaintiff did not formally apply for the Interim Area Director position. Based on this factual finding, the ALJ concluded that Plaintiff lacked standing to bring a claim based on the Durham Center's failure to promote her to the Interim Area Director position.[24] The issue before this court, then, is

---

**23.** In their original briefs, neither party addressed the extent to which the ALJ's findings in the Final Decision issued August 6, 2003, have issue-preclusive effect on Plaintiff's non-promotion claim in this court, and I ordered further briefing. I also ordered Plaintiff to inform the court whether she had sought judicial review of the ALJ's Final Decision. The parties have now briefed this issue, and Plaintiff has informed the court that she did not seek judicial review of the ALJ's decision.

**24.** On February 27, 2003, the ALJ began conducting a hearing on Plaintiff's claims. Before the presentation of her evidence, Plaintiff withdrew her age discrimination claim.

whether the ALJ's findings have issue-preclusive effect on Plaintiff's claims here.

■ I first note that since the federal full faith and credit statute does not apply to prior unreviewed state administrative decisions, any issue preclusion arising out of the ALJ's administrative findings cannot be based on the federal full faith and credit statute. In *University of Tennessee v. Elliott,* however, the United States Supreme Court held that even though the full faith and credit statute is not controlling as to unreviewed state administrative decisions, the principles behind the statute inform the question of whether, under federal common law rules of preclusion, unreviewed state administrative fact findings have issue-preclusive effect on subsequent federal court proceedings. 478 U.S. 788, 794, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986); *see also Davenport v. North Carolina Dep't of Transp.,* 3 F.3d 89, 93 n. 4 (4th Cir.1993). The *Elliott* Court noted that since the full faith and credit statute antedates the development of administrative agencies, it "clearly does not represent a congressional determination that the decisions of state administrative agencies should *not* be given preclusive effect." *Id.* at 795, 106 S.Ct. 3220 (emphasis added). Nor, according to the *Elliott* Court, was there any indication that Congress did not intend for these traditional principles to be extended to later developments such as administrative agencies. Thus, the *Elliott* Court held that when an administrative

agency "acting in a judicial capacity ·resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Id.* at 788, 106 S.Ct. 3220.

■ The *Elliott* Court went on to hold, however, that the statutory scheme governing Title VII clearly indicated that Congress did not intend for unreviewed state administrative findings to have preclusive effect as to Title VII claims subsequently brought in federal court, regardless of any preclusive effect state law might accord to them. *Elliott,* 478 U.S. at 796–97, 106 S.Ct. 3220; *see also G.V.V. Rao v. County of Fairfax Virginia,* 108 F.3d 42, 45–46 (4th Cir.1997) (refusing to give preclusive effect to unreviewed administrative Title VII decision). In *Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 107–08, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991), the Court reached the same conclusion with respect to age discrimination claims brought under the ADEA.[25] Thus, it is now settled that unreviewed state agency findings are not entitled to any preclusive effect in a subsequent federal action under Title VII, *see Elliott,* 478 U.S. at 795–96, 106 S.Ct. 3220, or the ADEA, *see Astoria,* 501 U.S. at 111–12, 111 S.Ct. 2166, and Plaintiff is free to relitigate the issue of non-promotion as to these claims.

**25.** The Title VII exception to the issue preclusion doctrine was based substantially upon the wording of 42 U.S.C. § 2000e–5(b), which requires the EEOC to give "substantial weight" to the findings of state or local authorities charged with enforcing anti-discrimination laws. The *Elliott* Court noted "it would make little sense for Congress to write such a provision if state agency findings were entitled to preclusive effect in Title VII actions in federal court." The Supreme Court later stated in *Astoria* that although the lan-

guage of the ADEA does not contain Title VII's "express delimitation of the respect owed to state agency findings," the ADEA's filing requirements make clear that collateral estoppel should not apply to ADEA claims. *Astoria,* 501 U.S. at 110–11, 111 S.Ct. 2166. Thus, like Title VII, the ADEA "carries an implication that the federal courts should recognize no preclusion by state administrative findings with respect to age-discrimination claims." *Id.*

The *Elliott* Court further stated, however, that unreviewed administrative findings *may* have issue-preclusive effect in a subsequent action under one of the Reconstruction civil rights statutes, including claims brought through § 1983, because the legislative history of these statutes "does not in any clear way suggest that Congress intended to repeal or restrict the traditional doctrines of preclusion.'" *Id.* at 797, 106 S.Ct. 3220 (quoting *Allen v. McCurry,* 449 U.S. at 98, 101 S.Ct. 411). Thus, the Court held that with regard to these types of claims federal courts must give a state administrative agency's fact-finding the same issue-preclusive effect it would receive in the state's own courts. *Elliott,* 478 U.S. at 799, 106 S.Ct. 3220; *see also generally Dionne v. Mayor & City Council of Baltimore,* 40 F.3d 677, 685 (4th Cir.1994).

In applying *Elliott* to this case, I first find that the state ALJ was acting in a judicial capacity when he issued his factual findings in the Final Decision dated August 6, 2003. Furthermore, Plaintiff certainly had the opportunity to litigate, and did litigate, the issue of whether she formally applied to be promoted to the Interim Area Director position. Therefore, the requirements of issue preclusion under *Elliott* are met, and the state ALJ's factual finding that Plaintiff never applied for the Interim Area Director position has issue-preclusive effect as to at least some of Plaintiff's claims in this court. Under *Elliott,* the findings have no preclusive effect as to Plaintiff's Title VII and ADEA claims. *Elliott,* 478 U.S. at 796–97, 106 S.Ct. 3220. The ALJ's factual findings do have preclusive effect, however, as to Plaintiff's First Amendment and § 1981 claims brought through § 1983. *See, e.g., Swain v. Elfland,* 145 N.C.App. 383, 388–89, 550 S.E.2d 530, 535 (2001) (discussing *Tennessee v. Elliott* and collateral estoppel); *King v. North Carolina Dep't of Transp.,* 121 N.C.App. 706, 707, 468 S.E.2d

486, 488–89 (1996) (stating that issue preclusion barred relitigation of the plaintiff's 42 U.S.C. § 1983 race discrimination claim where an administrative law judge made a finding in a prior contested case hearing that the plaintiff was fired for just cause); *see also Dai v. University of North Carolina at Chapel Hill,* No. 1:02CV224, 2003 WL 22113444, at *12 (M.D.N.C. Sept. 2, 2003) ("North Carolina courts have found that collateral estoppel barred plaintiffs' relitigation of race discrimination under 42 U.S.C. § 1983, where the issue had been raised and resolved in a prior administrative proceeding.") (citing *King* ). Thus, Plaintiff is barred from basing her First Amendment and § 1981 race discrimination claims on her alleged non-promotion. Thus, I confine the analysis of Plaintiff's § 1981 race discrimination and First Amendment claims to her allegations of a retaliatory firing in August 2002.

*Whether Plaintiff States A Claim for Race Discrimination under 42 U.S.C. § 1981*

■ I first address the motion to dismiss Plaintiff's claim against Defendant Durham Center for race discrimination in violation of 42 U.S.C. § 1981 arising out of the alleged retaliatory firing of Plaintiff. Section 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and territory to make and enforce contracts, to sue, be parties, give evidence, *and* to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). This circuit's court of appeals has held that courts should employ the same analysis with respect to § 1981 race discrimination claims as that used in Title VII race discrimination cases. *See*

*Causey v. Balog,* 162 F.3d 795, 804 (4th Cir.1998) (stating that elements of a prima facie case are the same under Title VII and § 1981). Furthermore, the United States Supreme Court has held that in a suit brought against a state actor, § 1983 is the exclusive federal remedy for a violation of the rights guaranteed under § 1981.[26] *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 735–36, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Thus, a § 1981 claim in effect merges with § 1983, and courts treat the claims as a single claim. To establish liability under 42 U.S.C. § 1983, a plaintiff must prove two essential elements: (1) that the defendants acted under color of state law and (2) that the plaintiff suffered a deprivation of a constitutional right as a result of that action.[27] *See, e.g., Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The "under color of state law" element requires a showing of an official policy or custom by the defendant that led to the deprivation of a constitutional right. Thus, the § 1983 requirement that plaintiffs show an official policy or custom of discrimination controls in § 1981 actions against local governments. In other words, local governments cannot be held liable under a theory of respondeat superior for the constitutional violations of their employees acting within the scope of their employment. *See, e.g., Monell v. Department of Soc. Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (where the Department of Social Services and Board of Education of New York city officially adopted a policy requiring pregnant employees to take unpaid maternity leaves before medically necessary); *Spell v. McDaniel,* 824 F.2d 1380, 1385 (4th Cir. 1987). A § 1983 plaintiff alleging § 1981 race discrimination must therefore adequately plead and ultimately prove three elements: (1) the existence of an official policy or custom (2) that is fairly attributable to the local government (3) that proximately caused the underlying § 1981 race discrimination. *Jordan ex rel. Jordan v. Jackson,* 15 F.3d 333, 338 (4th Cir.1994). An official policy may include: an express oral or written policy; decisions of a person with final policymaking authority; an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." *Carter v. Morris,* 164 F.3d 215, 217 (4th Cir.1999).

Here, Plaintiff has not alleged any official policy or custom of race discrimination by Defendant Durham Center, nor can any inference be drawn from the

---

**26.** In the Civil Rights Act of 1991, Congress amended § 1981 to include a provision that "[t]he rights protected by [§ 1981] are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c). Some courts have construed this provision to mean that plaintiffs need not pursue their § 1981 claims through § 1983. I note that this circuit's court of appeals has rejected such an interpretation. *Dennis v. County of Fairfax,* 55 F.3d 151, 156 n. 1 (4th Cir.1995) (stating that "we do not believe that this aspect of *Jett* was affected by the Civil Rights Act of 1991"). Thus, in this circuit, the holding from *Jett* that plaintiffs must bring their § 1981 claims through § 1983 is still good law.

**27.** Section 1983 itself creates no rights; rather, it provides a method for vindicating federal rights elsewhere conferred. Thus, to state a claim under § 1983, a plaintiff must allege the violation of a right preserved by another federal law or by the Constitution. *Kendall v. City of Chesapeake,* 174 F.3d 437, 440 (4th Cir.1999). As the United States Supreme Court has stated, "one cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything." *Gonzaga University v. Doe,* 536 U.S. 273, 285, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) (quoting *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)).

Amended Complaint that the alleged race discrimination against Plaintiff was caused by an official policy or custom of the Durham Center. Thus, Plaintiff has not sufficiently stated a § 1981 claim against Defendant Durham Center, and this claim should be dismissed. *See, e.g., Ihekwu v. City of Durham,* 129 F.Supp.2d 870, 888–89 (M.D.N.C.2000).

*Whether Plaintiff States A Claim for a Violation of her First Amendment Rights*

 I next consider the motion to dismiss Plaintiff's claim that Defendant Durham Center violated her First Amendment right not to be retaliated against for speaking on matters of public concern.[28] In support of her argument that Defendant Durham Center violated her First Amendment rights, Plaintiff alleges that the center fired her after she complained about its alleged violations of North Carolina's Open Meetings Law and alleged violations of state and local hiring procedures. For the following reasons, I recommend that the court grant the motion to dismiss as to Plaintiff's First Amendment claim.

 It is well settled that citizens do not relinquish all of their First Amendment rights by virtue of accepting public employment. *See United States v. National Treasury Employees Union,* 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995); *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The United States Supreme Court held in *Pickering v. Board of Education* that a government employee may exercise his right to speak as a citizen on issues of public importance as long as the employee's interest in exercising free speech is not outweighed by the countervailing interest of the government employer in providing the public service the employee was hired to provide. Thus, to prove a First Amendment violation under *Pickering,* a public employee must demonstrate (1) that he spoke out as a citizen about a matter of public concern; (2) that his interest in exercising free speech is not outweighed by the countervailing interest of the government employer in providing the public service the employee was hired to provide; (3) that the employee suffered an adverse employment action; and that (4) the employee's expression of protected speech played a substantial role or was a motivating factor in the adverse employment action taken by the employer. *Stroman,* 981 F.2d at 156.

Courts have stated that matters of public concern include speech that "relat[es] to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. Speech falling into this category includes informing the public that a governmental entity failed to "discharg[e] its governmental responsibilities" or "bring[ing] to light actual or potential wrongdoing or breach of public trust [on the part of a governmental entity or any officials therein]." *Id.* at 148, 103 S.Ct. 1684. The employee must be speaking as a citizen, not as an employee for

---

**28.** Defendants base their motion to dismiss this claim in part on their contention that Plaintiff has improperly attempted to bring her First Amendment claim directly rather than invoking her First Amendment rights through a § 1983 action. The court should not dismiss the First Amendment claim on this technical argument and should instead deem Plaintiff's complaint to allege the First Amendment claim as one brought through § 1983 rather than as a direct action under the First Amendment. *See, e.g., Morris v. Washington Metro. Area Transit Auth.,* 702 F.2d 1037, 1042 (D.C.Cir.1983) (where the court deemed the complaint to allege a cause of action under § 1983 rather than as a direct action under the Fourteenth Amendment).

personal interest purposes. *Id.* at 146–47, 103 S.Ct. 1684. Thus, matters of public concern do not include "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest." *Stroman*, 981 F.2d at 156. Courts have recognized in some situations, however, an employee's complaints may constitute mixed speech-that is, speech based on both personal as well as public matters. In those cases, employees are protected to the extent that their complaints in part address matters of public concern. *See, e.g., Banks v. Wolfe County Board of Educ.*, 330 F.3d 888, 894 (6th Cir.2003) (where an employee applied for and was not hired for a position and then complained that the hiring board violated its own hiring procedures and wasted public funds, the complaint was both personal and public and therefore protected speech). In determining whether an employee's speech arises out of a personal grievance or touches on matters of public concern, or is a combination of the two, a court must examine the content, context, and form of the speech at issue in light of the entire record. *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684.

 Here, Plaintiff alleges that after she was denied a promotion she spoke out about the Durham Center's violation of North Carolina's Open Meetings Law, failure to follow personnel procedures, and waste of public funds in the center's selection of an Interim Area Director. Plaintiff contends that Defendant Durham Center fired her for speaking out on these issues. I find that Plaintiff's speech focused both on both internal policy and personnel grievances (Plaintiff's failure to be promoted) and on matters of public concern (the Durham Center's alleged failure to follow hiring procedures and the center's violation of North Carolina's Open Meetings Law). I need not analyze the claim further, however, because, like Plaintiff's claim for § 1981 race discrimination, Plain-

tiff has not alleged any official policy or custom by the Durham Center that would subject it to § 1983 liability based on a First Amendment violation. *See, e.g., Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 965–66 (4th Cir.1995). Therefore, it is recommended that Plaintiff's § 1983 action alleging a First Amendment violation be dismissed.

*Whether Plaintiff States A Claim under Title VII*

 I next address the motion to dismiss Plaintiff's Title VII claim against the Durham Center based on non-promotion and retaliatory firing. A plaintiff can prove a Title VII violation in one of two ways. *EEOC v. Clay Printing Co.*, 955 F.2d 936, 940 (4th Cir.1992). First, he can offer direct and circumstantial evidence that he suffered an adverse employment action because of discrimination based on his race, sex, color, national origin, or religion. *Goldberg v. B. Green & Co.*, 836 F.2d 845, 847 (4th Cir.1988). Second, a plaintiff may use the McDonnell Douglas scheme of shifting burdens. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this scheme, once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision. If the employer meets this burden, the plaintiff must then show that the employer's proffered reason was mere pretext and that race was the more likely reason for his dismissal. *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir.1997). An employment discrimination plaintiff need not plead specific facts in his complaint establishing a prima facie case of discrimination under the *McDonnell Douglas* framework. *Swierkiewicz v. Sorema*, 534 U.S. 506, 515, 122 S.Ct. 992, 152

L.Ed.2d 1 (2002). Instead, the plaintiff must comply with Federal Rule of Civil Procedure 8(a)(2), which provides that a complaint must only include a "short and plain statement of the claim showing that the pleader is entitled to relief in order to provide defendant fair notice of the nature of the plaintiff's claims and the grounds upon which they rest." *Id.* at 512, 122 S.Ct. 992 (citing *Conley,* 355 U.S. at 47, 78 S.Ct. 99).

▮▮▮▮ Here, Plaintiff first alleges that Defendant Durham Center denied her a promotion and ultimately fired her because of her race and color.[29] To establish a prima facie case of discriminatory failure to promote, Plaintiff must prove that (1) she applied for the position in question; (2) she was qualified for the position; and (3) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination based on her race, color, sex, religion, or national origin. *Halperin,* 128 F.3d at 201; *Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994). Here, in support of her Title VII claim based on non-promotion, Plaintiff alleges that (1) she had worked at the Durham Center without incident since 1977 and that in early 2002 she applied for a promotion to the Area Director position. She further alleges that when she applied for the promotion she was serving as the center's only Deputy Area Director, and that under the center's policies the person serving as the Deputy Area Director was to serve as "acting" Area Director in the absence of a permanent Area Director. Plaintiff further alleges that she had extensive education and knowledge of the Durham Center and the community served by the center, but that the center hired a white non-employee with less extensive knowledge and education than Plaintiff to fill the position. I find that Plaintiff has stated a Title VII race discrimination claim based on non-promotion sufficient to survive the motion to dismiss, and I recommend that the court deny Defendant Durham Center's motion to dismiss as to this claim.

▮▮▮▮ Plaintiff also brings a Title VII retaliation claim against the Durham Center. To establish a prima facie case of retaliation, the employee must show (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal connection between the protected activity and the adverse employment action. *See King v. Rumsfeld,* 328 F.3d 145, 150–51 (4th Cir.2003). An employee has engaged in activity protected by Title VII if she has either (1) "opposed any practice made an unlawful employment practice" under Title VII or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." *See* 42 U.S.C. § 2000e–3(a) (2001); *Laughlin v. Metropolitan Wash. Airports Auth.,* 149 F.3d 253, 258–59 (4th Cir.1998). Here, Plaintiff alleges she was discriminated against because of her race and color when she was not promoted to the position of Area Director, that she complained about the racial discrimination to her supervisor Ellen Holliman, that she filed an EEOC

---

**29.** As discussed previously, the state ALJ's factual findings regarding whether Plaintiff applied for the position of Interim Area Director lack issue-preclusive effect as to Title VII and ADEA claims. *See G.V.V. Rao v. County of Fairfax Virginia,* 108 F.3d 42, 45–46 (4th Cir.1997) (in a Title VII case in federal court, refusing to give preclusive effect to prior unreviewed state administrative findings). Thus, application of the *Elliott* preclusion rule leads to the anomalous circumstance in this case that the parties may not relitigate the issue of whether Plaintiff has a claim for discriminatory non-promotion under § 1983, but they are free to relitigate the issue of whether she has a claim for discriminatory non-promotion under Title VII and the ADEA.

charge alleging race, color, and age discrimination, and that Holliman fired her in retaliation for complaining about the discrimination. *See* Amended Compl. ¶¶ 17(g), (j). Plaintiff has sufficiently alleged that she engaged in protected activity by opposing an unlawful employment practice under Title VII and that she was fired for engaging in the protected activity. *Thompson v. Potomac Elec. Power. Co.*, 312 F.3d 645, 650 (4th Cir.2002). Thus, I find that Plaintiff has stated a claim for Title VII retaliation against the Durham Center sufficient to withstand a motion to dismiss, and the court should therefore deny the motion to dismiss by Defendant Durham Center as to Plaintiff's Title VII retaliation claim.

*Whether Plaintiff has Stated a Claim for Age Discrimination under the ADEA*

■ I next address the motion to dismiss Plaintiff's age discrimination claim based on non-promotion and retaliatory firing. The ADEA is subject to the same burdens of proof as those applied in Title VII claims, including the *McDonnell Douglas* shifting burdens scheme. *Clay Printing Co.*, 955 F.2d at 940 (adapting *McDonnell Douglas* to ADEA cases). To allege a prima facie claim for age discrimination under the *McDonnell Douglas* scheme, the plaintiff must show: (1) that she was an employee covered by the ADEA (at least forty years old); (2) that she was performing according to her employer's legitimate expectations; (3) that she suffered an adverse employment action; and (4) she suffered the adverse employment action under circumstances giving rise to an inference of unlawful discrimination based on her age, i.e., she was replaced by someone substantially younger. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). As to whether Plaintiff has stated a claim for age discrimination based on non-promotion, although Plaintiff did not state her age in the Amended Complaint, she did allege in her EEOC charges that she was at least forty years old when the alleged discriminatory acts occurred.[30] Furthermore, as I noted previously, Plaintiff sufficiently alleged that she was qualified to be promoted to the Area Director position. In addition, Plaintiff alleges that she was asked age-related questions during her interview, which is sufficient to draw an inference that Plaintiff was denied the promotion because of her age. Viewing the Amended Complaint in the light most favorable to the plaintiff, I find that Plaintiff has sufficiently stated a claim for age discrimination against the Durham Center based on non-promotion.[31] Therefore, I recommend that the motion to dismiss Plaintiff's age discrimination claim based on non-promotion should be denied.

■ Plaintiff also brings a claim for retaliation under the ADEA. As with

---

**30.** A Letter of Determination in the record indicates that Plaintiff alleged in an EEOC charge that she was 55 years old when she was fired. *See* EEOC Determination, Dec. 24, 2002, at 2.

**31.** This is a closer call than the non-promotion claim under Title VII. Other than the vague allegation that she was asked "age-related" questions during her interview, Plaintiff makes no other allegations giving rise to an inference that her age played a role in the decision not to promote her. For instance, the Amended Complaint does not state Defendant Holliman's age; therefore, it is impossible to tell from merely examining the pleadings whether someone "substantially younger" than Plaintiff was given the position. *See O'Connor*, 517 U.S. at 313, 116 S.Ct. 1307. In keeping with the liberal "notice pleading" rules, however, I will allow this claim to survive Defendants' 12(b)(6) motion, while reminding Plaintiff that her burden will be higher if she wishes to pursue it at the summary judgment stage.

Plaintiff's Title VII claim, I find that Plaintiff has sufficiently alleged a claim for retaliation under the ADEA. Under the ADEA's retaliation provision, employers may not retaliate against employees or applicants for employment who participate in protected activities relating to their charges of age discrimination.[32] *See* 29 U.S.C. §§ 621–34. In analyzing retaliation claims brought under the ADEA, courts employ the same standards adopted for retaliation claims brought under Title VII. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Here, Plaintiff sufficiently alleges that she filed an EEOC charge in part based on age discrimination and that Defendant fired her in retaliation for filing the EEOC charge. I find that Plaintiff has sufficiently stated a claim for retaliation under the ADEA, and the court should therefore deny the motion to dismiss Plaintiff's age discrimination retaliation claim against the Durham Center.

*Whether Plaintiff States A Claim Against the Durham Center for a Violation of North Carolina's Whistleblower Act*

■ I next address the motion to dismiss Plaintiff's claim against Defendant Durham Center brought under the North Carolina Whistleblower Act ("the Act"), located at N.C. GEN. STAT. §§ 126–84 and 126–85, and which provides, in pertinent part, that

(a) No head of any State department, agency or institution or other State employee exercising supervisory authority shall discharge, threaten or otherwise discriminate against a State employee regarding the State employee's compensation, terms, conditions, location, or privileges of employment because the State employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, any activity described in G.S. 126–84, unless the State employee knows or has reason to believe that the report is inaccurate.

Those activities listed in § 126–84 include (1) A violation of State or federal law, rule or regulation; (2) Fraud; (3) Misappropriation of State Resources; (4) Substantial and specific danger to the public health and safety; or (5) Gross mismanagement, a gross waste of monies, or gross abuse of authority.[33] N.C. GEN. STAT. § 126–84 (1993). In analyzing claims brought under the state whistleblower statute, North Carolina courts generally follow the same shifting-burdens analysis used in Title VII claims. *Kennedy v. Guilford Tech. Community College*, 115 N.C.App. 581, 584, 448 S.E.2d 280, 282 (1994). Thus, to state a claim under the state whistleblower statute, the plaintiff must allege that she (1) engaged in activity protected by the statute; (2) that she was subjected to an adverse employment action; and (3) that her participation in the protected activity was a substantial or motivating factor in the adverse employment action. *Id.* (quoting *McCauley v. Greensboro City Bd. of Educ.*, 714 F.Supp. 146, 151 (M.D.N.C. 1987)). Once a prima facie case is made, the defendant must then articulate a legitimate, non-discriminatory reason for the

---

**32.** The ADEA provides that it is "unlawful for an employer to discriminate against any of his employees or applicants for employment ... because such individual ... has opposed any practice made unlawful by this section, or because such individual ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

**33.** It is undisputed that Plaintiff is an employee covered under the Whistleblower Act. N.C. GEN. STAT § 126–5 provides that employees covered under the Act include "all employees of area mental health, mental retardation, substance abuse authorities ...."

adverse employment action. *Kennedy,* 115 N.C.App. at 585, 448 S.E.2d at 282. If the defendant meets its burden of production, the plaintiff must then come forward with evidence to show that the legitimate reason was a mere pretext for the retaliatory action. *Id.* Thus, a plaintiff retains the ultimate burden of proving that the adverse employment action would not have occurred had Plaintiff not engaged in activity protected under the statute. *Id.* Upon a showing of retaliation under the whistleblower statute, the employee is entitled to "damages, an injunction, or other remedies." N.C. GEN. STAT. § 126–86; *see also Hanton v. Gilbert,* 126 N.C.App. 561, 571, 486 S.E.2d 432, 439 (1997); *Minneman v. Martin,* 114 N.C.App. 616, 618–19, 442 S.E.2d 564, 566 (1994).

■ Here, Plaintiff has alleged that she engaged in activity that is protected under the state whistleblower act-that is, she alleges that she complained that Defendant Durham Center held open meetings in violation of the North Carolina Open Meetings Law and that the center wasted public funds and violated personnel procedures when selecting an Interim Area Director. Furthermore, Plaintiff alleged that she was fired for complaining about this activity. I find that Plaintiff has alleged a state whistleblower claim against Defendant Durham Center sufficient to withstand Defendants' motion to dismiss, and I therefore recommend that the court deny the motion to dismiss as to Defendant Durham Center.

*Plaintiff's Motion to Amend the Amended Complaint*

■ Finally, Plaintiff requests that the court allow her to amend her Amended Complaint to assert each of her five claims against Defendants Knight, Holliman, and Black in their individual capacities and to add certain factual allegations relating to the individual liability of these three individuals. This circuit's court of appeals has stated that "[l]eave to amend may properly be denied where amendment would be futile." *GE Inv. Private Placement Partners, II v. Parker,* 247 F.3d 543, 548 (4th Cir.2001) (citing *HCMF Corp. v. Allen,* 238 F.3d 273, 276 (4th Cir.2001)). Here, it would be futile to permit an amendment to allege Title VII and ADEA liability against Black, Holliman, and Knight in their individual capacities because supervisors and agents are not liable in their individual capacities for Title VII or ADEA violations. *Lissau v. Southern Food Serv., Inc.,* 159 F.3d 177, 181 (1998); *Love–Lane,* 201 F.Supp.2d at 574 (citing *Lissau* and noting that "it is well-established that Congress intended for the Title VII remedial scheme to apply only to employers, not individual supervisors"). Therefore, the motion to amend the Amended Complaint to sue Black, Knight, and Holliman in their individual capacities should be denied as to Plaintiff's Title VII and ADEA claims.

■ As to Plaintiff's § 1983 claims alleging a First Amendment violation and race discrimination under § 1981, it would be futile to allow Plaintiff to amend her complaint to sue Defendants Knight and Black in their individual capacities as to these claims.[34] To establish individual liability under § 1983, a plaintiff must show that the "official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins,* 766 F.2d 841, 850 (4th Cir.1985). Thus, each defendant must have had personal knowledge of and involvement in the alleged violations of con-

**34.** It is well established that defendants may be held liable in their individual capacities under 42 U.S.C. § 1983. *See Hafer v. Melo,* 502 U.S. 21, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (holding that a § 1983 claim may be brought against a state official in his individual capacity for actions taken in his official capacity).

stitutional rights or, in the case of a supervisor, tacitly approved the anticipated conduct of a subordinate. *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984); *Johnson v. Resources for Human Dev., Inc.*, 843 F.Supp. 974, 978 (E.D.Pa.1994). As to the § 1983 claims here, Plaintiff fails to allege any individual actions by Defendants Black and Knight that would constitute a violation of Plaintiff's First Amendment rights or race discrimination under § 1981. I have already concluded that the state ALJ's finding regarding Plaintiff's non-promotion claim has issue-preclusive effect as to Plaintiff's § 1983 claims here. Thus, Plaintiff is barred from basing her § 1983 claims against Black and Knight in their individual capacities on the basis of their individual participation in Plaintiff's non-promotion. Plaintiff's § 1983 claims against Black and Knight individually must therefore be based only on the allegation of retaliatory firing. Nothing in the Amended Complaint or the Proposed Amended Complaint, however, suggests that Black or Knight had the authority to fire Plaintiff or individually participated in the firing. *See* Amended Compl. ¶ 17(j); Proposed Amended Compl. ¶ 17(p). Indeed, by Plaintiff's own allegations the sole individual responsible for firing Plaintiff was Defendant Holliman, who was Plaintiff's immediate supervisor. Plaintiff would like to amend her Amended Complaint to add allegations that Defendants Black and Knight are individually liable for the First Amendment and § 1981 violations because they "gave relevant advice to Defendant Board and Defendant Holliman pertaining to the discrimination and retaliation alleged in this lawsuit"; that by virtue of their positions as a Durham Center Area Board member and Durham County Commissioner (Black) and as the Director of Human Resources for Durham County (Knight), Defendants Black and Knight held "position[s] of responsibility with regard to the discriminatory and re-

taliatory conduct endured by Plaintiff"; that Defendants Black and Knight were in positions to "prevent the foreseeable wrongs"; that Defendants Black and Knight "engaged in bad faith and malicious conduct … regarding the discrimination and retaliation received by Plaintiff during her employment"; and that Defendants Black and Knight "furthered the discriminatory and retaliatory conduct alleged above." *See* Proposed Amended Compl. ¶ 17(n), (o). These conclusory allegations come with no factual support to sufficiently link Defendants Black and Knight to the alleged discriminatory firing of Plaintiff; thus, the First Amendment and § 1981 claims against Defendants Black and Knight in their individual capacities could not survive a motion to dismiss. *See, e.g., Behnia v. Shapiro*, 961 F.Supp. 1234, 1237 (N.D.Ill.1997) (stating that individual liability under § 1981 attaches only where the individual himself participated in the discrimination). Any amendment would therefore be futile, and I recommend that the court deny the motion to amend the Amended Complaint to allege individual liability against Defendants Black and Knight on the First Amendment and § 1981 claims.

■ Finally, as to Plaintiff's state whistleblower claim, there can be no individual liability against Black or Knight as to that claim either because the North Carolina whistleblower statute allows an employee to maintain an action only "against the person or agency who committed the violation." N.C. GEN. STAT. §§ 126–84, to –86 (1993). Here again, Plaintiff does not allege any individual action by Black or Knight taken in retaliation for Plaintiff speaking out about the Durham Center's alleged wrongful practices. Defendant Black is not subject to individual liability under the state whistleblower laws merely based on her status as

a member of the Area Board or as a Durham County Commissioner. Likewise, Defendant Knight is not subject to individual liability merely based on her status as the Director of Human Resources for Durham County. Therefore, the motion to amend should be denied to the extent that Plaintiff wishes to sue Defendants Black and Knight in their individual capacities on the state whistleblower claim. I cannot conclude, however, that an amendment naming Holliman as a defendant in her individual capacity would be futile as to the First Amendment, § 1981 race discrimination, or state whistleblower claim; therefore, I recommend that the court allow Plaintiff to amend the Amended Complaint to name Holliman as a defendant in her individual capacity as to these claims.[35]

## CONCLUSION

Therefore, **I RECOMMEND** that the court **GRANT** Defendants' motion to dismiss in part and **DENY** the motion in part. The court should dismiss all claims as to all Defendants except for the Title VII, ADEA, and state whistleblower claims against Defendant Durham Center. Furthermore, the court should allow Plaintiff to amend her Complaint to allege state whistleblower, First Amendment, and § 1981 claims against Holliman in her individual capacity. Therefore, the only remaining claims surviving the motion to dismiss should be the Title VII, ADEA, and state whistleblower claims against Defendant Durham Center and the § 1981, First Amendment, and state whistleblower claims against Defendant Holliman in her individual capacity.

### ORDER

On DATE, in accordance with 28 U.S.C. § 636(b), the Recommendation of the United States Magistrate Judge was filed and notice was served on the parties in this action and a copy was given to the court.

Within the time limitation set forth in the statute, Plaintiff objected to the Recommendation.

The court has appropriately reviewed the portions of the Magistrate Judge's report to which objection was made and has made a de novo determination which is in accord with the Magistrate Judge's report. The court hereby adopts the Magistrate Judge's Recommendation.

**IT IS THEREFORE ORDERED** that Defendants' motion to dismiss be **GRANTED IN PART** and **DENIED IN PART**. All claims as to all Defendants except for the Title VII, ADEA, and state whistleblower claims against the Defendant Durham Center will be dismissed with prejudice. Plaintiff will be allowed to amend her Complaint to allege the state whistleblower, First Amendment, and § 1981 claims against Holliman in her individual capacity.

---

**35.** Defendant Holliman contends that an amendment to allege liability against her in her individual capacity would be futile because she has qualified immunity as to any § 1983 claims brought against her in her individual capacity. The issue of qualified immunity is better left to be resolved at summary judgment or at trial. See, *e.g., Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 253 (2nd Cir. 1991).